Carl **SHELDEN** and Mary **Shelden, Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 164–88 L.

United States Court of Federal Claims.

Oct. 31, 1995.

358

Brenda Grantland, Mill Valley, CA, for plaintiffs. Landon Dowdey, Washington, DC, of counsel.

Andrew M. Eschen, Washington, DC, United States Department of Justice, Environment and Natural Resources Division, for defendant.

## OPINION

SMITH, Chief Judge.

This takings case is on remand from the United States Court of Appeals for the Federal Circuit to determine the proper compensation due plaintiffs for the taking of their owner-financed second mortgage. Plaintiffs, Carl and Mary Shelden, were innocent mortgagees of real property, which was forfeited to the government when the mortgagor was convicted of violating the Racketeer Influenced and Corrupt Organizations Act (RICO). The Federal Circuit found that before the mortgage was destroyed by the judgment of forfeiture, the Sheldens' had a compensable property interest. *Shelden v. United States,* 7 F.3d 1022, 1031 (Fed.Cir. 1993). The Federal Circuit determined that "the government's actions did destroy the mortgage and take the ... Sheldens' interest in the property." *Id.* Therefore, the government has an obligation to pay just compensation to the Sheldens. After careful consideration of the briefs and testimony at trial, this court issues the following opinion on the amount of compensation due the plaintiffs.

## BACKGROUND

In May 1979, plaintiffs Carl and Mary Shelden sold real property located at 1065 Wickham Drive, Moraga, California to Ralph and Freddie Jean Washington for $289,000, receiving in partial payment a promissory note for $160,435.65 secured by a Deed of Trust. Under the note, the Washingtons were to make monthly payments of $1,602.41 until June 1, 1986, at which time the balance became due. The note contained a "due on sale" clause, which provided that the mortgagee had the right to accelerate the payment of the balance if "the Beneficiary [the Washingtons] sells, agrees to sell, transfers, or conveys its interest in the real property or any part thereof or any interest therein." As part of the Deed of Trust, the Washingtons assumed a previous mortgage on the Moraga property in the amount of $53,564.35 held by Santa Barbara Savings & Loan.

On February 15, 1983, the Washingtons were indicted for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1961–68 (1992). The indictment alleged that the Moraga property was subject to forfeiture under RICO. To secure payment of their bail bonds, the Washingtons conveyed the Moraga property to the Clerk of the United States District Court for the Northern District of California by a Deed of Trust with power of sale on March 7, 1983, which began the three month redemption period required by California law

before a foreclosure is allowed. See Cal.Civ. Code § 2924c(b)(1) (West 1986 & Supp.1995). With the note $6,264 in arrears, the Sheldens' trustee filed a notice and election to sell the Moraga property on October 7, 1983. On December 1, 1983, a jury found Ralph Washington guilty of RICO violations and declared all of his property forfeited pursuant to 18 U.S.C. § 1963. Based on this jury verdict and declaration of forfeiture, the government filed a notice of *lis pendens* on the Moraga property on December 9, 1983. On January 31, 1984, the United States District Court for the Northern District of California entered an "Order Re Forfeiture of Properties and Disposition Thereof Pending Appeal," which provided that legal title would be transferred to the government pending appeal, but for the convenience of the parties the Washingtons would retain possession and record title. The Federal Circuit found that this order, as a matter of law, transferred title to the United States, which rendered the lien unenforceable, thereby destroying the value of the lien. *Shelden,* 7 F.3d at 1027.

In April 1984, the Sheldens again attempted to foreclose on their note. The government and the Washingtons intervened, and the United States District Court for the Northern District of California mediated a one month postponement of foreclosure. In May 1984, the Washingtons avoided foreclosure by paying the arrearage due on the mortgage. In April 1986, the Sheldens filed another notice of default, claiming that the Washingtons were again in arrears on their mortgage payments, and a foreclosure sale was scheduled for August 20, 1986. This foreclosure sale did not take place because the Washingtons filed for protection under Chapter 11 of the Bankruptcy Code a few hours before the sale was to occur. During this time, the Sheldens learned that the hill, upon which the property was built, had been allowed to substantially erode. In early 1987, the bankruptcy court found that the Washingtons had no equity remaining in the Moraga property and released it from the bankruptcy estate. The bankruptcy court so found because the structural and cosmetic damage to the house diminished the value of the Moraga property to less than the remainder due on the two mortgages. The Shel-

dens noticed a foreclosure sale for February 23, 1987, at which sale they were the highest bidder, purchasing the property for $115,500.

On August 20, 1986, the same day the Washingtons filed for bankruptcy, the Court of Appeals for the Ninth Circuit vacated Ralph Washington's conviction and remanded his case. *United States v. Washington,* 797 F.2d 1461 (9th Cir.1986). Ralph Washington entered a guilty plea on September 26, 1988, which conclusively forfeited his interest in the Moraga property to the United States. During this time, neither the forfeiture verdict, nor the forfeiture order was vacated. In the summer of 1990, the Sheldens learned that Ralph Washington's guilty plea irrevocably vested title to the Moraga property in the United States, even though the Sheldens had already foreclosed and purchased the Moraga property. On October 9, 1990, however, the government released the *lis pendens* and gave the Sheldens a quitclaim deed to the Moraga property.

The Sheldens filed a complaint in the United States Claims Court on March 11, 1988, alleging that the government's actions constituted an uncompensated taking in violation of the Fifth Amendment. The court initially granted summary judgment in favor of the Sheldens on the issue of liability, finding that the government's actions constituted a taking. *Shelden v. United States,* 19 Cl.Ct. 247, 252 (1990). The government filed a Rule 60(b)(2) motion for relief from the Claims Court decision, alleging that it was not liable under newly discovered facts. After considering the new facts, this court vacated its earlier ruling and granted the government's motion dismissing this case. These new facts related to the willingness of the district court to allow the Sheldens to foreclose and its mediation efforts which the Sheldens accepted to bring the Washingtons' note current. *Shelden v. United States,* 26 Cl.Ct. 375, 378–79 (1992). This court held that there was no compensable taking because the Sheldens failed to show any actual damages from the government's placing a notice of *lis pendens* on the Moraga property. The court stressed that the government's actions did not actually prevent the Sheldens from foreclosing. *Id.* at 380. The Sheldens appealed to the

Federal Circuit, which reversed this court's decision based on the conclusion that the Sheldens could not enforce the mortgage against the United States after the property was forfeited. *Shelden,* 7 F.3d at 1028. The Federal Circuit held that the Sheldens' inability to enforce the mortgage, as a result of the government's action, destroyed the value of the mortgage, which resulted in a taking of Sheldens' property interest. Therefore, the Federal Circuit remanded the case to the Court of Federal Claims[1] to determine just compensation. *Id.* at 1031.

## DISCUSSION

■ The Fifth Amendment to the United States Constitution provides in relevant part: "[n]or shall private property be taken for public use without just compensation." The Federal Circuit decided that there was a compensable taking in this case, holding that "[w]hen the forfeiture order transferred all of the Washingtons' interest in the property to the United States, the government took a property interest from the Sheldens for a public purpose." *Shelden,* 7 F.3d at 1026. In that decision, the Federal Circuit defined the property interest that was taken as the mortgagee's (Sheldens') lien. *Id.* The Federal Circuit explained that, "the transfer to the United States altered not the lien itself, but its enforceability. Because the liens were no longer enforceable, their value had been destroyed, which constituted a taking entitling the plaintiffs to just compensation." *Id.* at 1027. The Federal Circuit concluded that, "[b]efore the mortgage was *destroyed* by the government's taking, the Sheldens had a compensable property interest. Immediately after the judgment of forfeiture they had *none.*" *Id.* at 1031 (emphasis added). The text of the Federal Circuit's decision indicates that the Sheldens' mortgage was destroyed, not just diminished in value. Likewise, in California property law there is a provision against deficiency judgments to enforce property liens, which also suggests that the value of a mortgage, which cannot be enforced against the property itself, has been destroyed. Cal.Civ.Proc.Code § 580b

(West 1972 & Supp.1995) (no deficiency judgment for purchase money mortgages). *See, e.g., Roseleaf Corp. v. Chierighino,* 59 Cal.2d 35, 27 Cal.Rptr. 873, 378 P.2d 97 (1963). In following the Federal Circuit's teaching, this court finds that the Sheldens' mortgage in the Moraga property was completely destroyed by the government's taking. Thus, this court finds that the full value of the Sheldens' mortgage was taken by the government.

In addition to defining the property interest that was taken, the Federal Circuit provided further direction to determine just compensation:

> Just compensation for a plaintiff in a takings case is typically defined as the fair market value of the property on the date it is appropriated. The United States must compensate the Sheldens for the fair market value of the mortgage on the Moraga property as of the date that the property was transferred to the United States. *Shelden,* 7 F.3d at 1031 (citations omitted).

The Federal Circuit, however, stated that the amount of compensation due should be lessened by the compensation already received and the market value of the property when the Sheldens regained clear title in October of 1990. *Id.* at 1030. The parties have disputed in their briefs the issues of fair market value; credits due to the United States; fees and expenses; and interest. The court provides the following guidelines on these issues so that parties may agree on the precise amount of just compensation due the plaintiffs.

## I. The Fair Market Value of the Mortgage

■ Following the Federal Circuit's determination that the entire mortgage was taken by the government on January 20, 1984; this court's initial task is to compute the value of the mortgage. Fair market value was defined in *Yancey v. United States,* 915 F.2d 1534 (Fed.Cir.1990) as "the price at which property would change hands in a transac-

---

1. As of October 29, 1992, the United States Claims Court became the "Court of Federal Claims," pursuant to Title IX of the Federal Courts Administration Act of 1992, Pub.L. 102–572, 106 Stat. 4506.

tion between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts." *Id.* at 1542 (quoting *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1054 n. 3 (Fed.Cir.1983)). This definition of fair market value was elaborated further in *Bowles v. United States,* 31 Fed.Cl. 37 (1994):

> The most probable price which a piece of property should bring in a competitive market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming that the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from the seller to the buyer under conditions whereby:
>
> 1. buyer and seller are typically motivated.
>
> 2. both parties are well informed or well advised, and each acting in what he considered his own best interest.
>
> 3. a reasonable time is allowed for exposure in the open market.
>
> 4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
>
> 5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. *Id.* at 46–47.

■ The goal of just compensation is to put the owner of property "in as good a position pecuniarily as if his property had not been taken." *Yancey,* 915 F.2d at 1543 (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934)). One method used to apply this definition is to make comparisons with sales of similar property interests. *See, e.g., Florida Rock Indus. Inc. v. United States,* 18 F.3d 1560, 1567 (Fed.Cir.1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995); *Bowles,* 31 Fed.Cl. at 47. This is the approach used by Mr. Guy Puccio, the government's mortgage brokerage expert. Mr. Puccio testified that comparable market sales could be used after accounting for several adjustments. First, the Washingtons' had exhibited difficulty in satisfying their obligation under the mortgage to make timely payments. Second, at the time at issue, Ralph Washington had been convicted of several felonies, and Freddie Jean Washington had been indicted. Third, real estate prices in California had declined since the mortgage was made. Fourth, this mortgage was an owner-financed second mortgage, in contrast to a more secure one issued by a lending institution. Mr. Puccio testified that these facts would have a negative effect on the market value of plaintiffs' mortgage such that the mortgage would only be worth $97,-000 on the secondary mortgage market. This court finds Mr. Puccio's analysis credible, but, as explained below, not dispositive on the issue of fair market value.

■ Under the definition of fair market value used in *Yancey* and *Bowles,* market prices are made fair by looking at transactions in which the price is not affected by undue stimulus and the buyer and seller are typically motivated. During cross examination, Mr. Puccio admitted that the market for secondary mortgages is atypical because the typical seller is not solely interested in obtaining the best price. Mr. Puccio admitted that discounts of between twenty and forty percent occur frequently, because sellers do not ordinarily sell second mortgages as part of their investment objectives. Instead, he explained that most secondary mortgage sellers have to sell because they need cash. According to Mr. Puccio, prices in the secondary mortgage market are often not typical and are subject to undue stimulus. Therefore the secondary mortgage market is not a definitive source that can supply a well-substantiated fair market value for the Sheldens' mortgage. *See Florida Rock,* 18 F.3d at 1567 (holding that active speculative markets that provide a well-substantiated value for the taken property may not be completely discarded as aberrational).

■ Trial judges are accorded discretion to take "a variety of factors into consideration to decide the best way to calculate the fair market value." *Yancey,* 915 F.2d at 1543. When a court is faced with an imperfect method for obtaining fair market value,

the proper course of action is to use the best method available, while attempting to compensate for its deficiencies. *Florida Rock*, 18 F.3d at 1567; *Yancey*, 915 F.2d at 1542; *Bowles*, 31 Fed.Cl. at 47. Mr. Puccio testified that thirty percent discounts are common on owner-financed second mortgages and suggested that most if not all of this discount was due to the fact that they are sold to raise cash and not as an investment objective. Using this uncontroverted testimony as a guide, the court concludes that the remaining discount Mr. Puccio would apply to the Sheldens' mortgage was attributable to the somewhat unique negative factors that applied to this mortgage. This court finds that starting with Mr. Puccio's original figure and adding thirty percent to correct for the discount attributable to the atypical secondary mortgage market provides a well-substantiated value for the taken property. Thus, this court finds that the fair market value for the taken mortgage is $141,043.93.[2] Both parties offered arguments contra to this finding. The court addresses these arguments in the ensuing paragraphs.

### A. Sufficient Equity

■ In the preceding analysis, the court relied on testimony by Mr. Puccio, who was a government witness. Mr. Puccio's estimate assumes that there was sufficient equity in the Moraga property to cover both mortgages. The government, however, contends that there was insufficient equity at the time of forfeiture and therefore the value of the mortgage held by the Sheldens should be correspondingly reduced. At the time of forfeiture, the balance due on the Sheldens' mortgage was $146,813.09, and the balance due on Santa Barbara Savings & Loan's first mortgage was $50,747.

At the forfeiture proceeding, a government attorney estimated that the property was worth $325,000 and had equity of "between a hundred and a hundred and fifty thousand dollars" over and above the value of the two mortgages. At trial, the government's real estate appraiser, Mr. Richard Betts, testified

that the value of the property in 1984 would have been only $150,000 because of repairs and associated stigma. Plaintiffs responded that most of the damage to the house occurred after 1984 and emphasized that no structural problems were disclosed when the United States attorney provided an estimate for forfeiture. The court finds interesting that when asked to provide an estimate of the value of the Moraga property in 1990, when the government quitclaimed it to the Sheldens, Mr. Betts testified that he believed the property was worth $190,000. Thus, he apparently found the value of the property to increase as the structural damages became more pronounced! This seems unlikely.

After reviewing the pictures taken at the time of forfeiture and considering relevant testimony, including the government's witnesses, the court finds that the amount of damage in 1984 was minor. This finding, that the defects were minor, suggests that the discount due to stigma would be minimal as well. Therefore, the court finds the government's argument for insufficient equity unpersuasive.

### B. Plaintiffs' Arguments for Using Face Value

■ In direct contrast to the government's position, plaintiffs argued for application of a face value method to find the fair market value of the property taken. However, plaintiffs did not introduce evidence based on market comparisons at trial. Instead, the plaintiffs argue that since there was sufficient equity in the property, they could have foreclosed and realized the full face value of their mortgage, which was $146,813.09 on the date it was appropriated. The Sheldens argue that the face value of the mortgage note is closer to fair market value because it reflects a seller who is "a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal." *Whitney Benefits v. United States*, 30 Fed.Cl. 411, 415 (1994) (quoting *United States v. 429.59 Acres of Land*, 612 F.2d 459, 464 (9th Cir.1980)), 25 Cl.Ct. 232

---

**2.** Mr. Puccio's estimate ($97,000) plus 30% of the original, or face value (30% of $146,813.09 = $44,043.93), which totals $141,043.93.

(1992), 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), *cert. denied,* 926 F.2d 1169 (Fed.Cir.1991), *aff'd,* 20 Cl.Ct. 324 (1990), *opinion corrected,* 18 Cl.Ct. 394 (1989), *on subsequent remand,* 31 Fed.Cl. 116 (1994). According to the Sheldens, reasonably prudent investors faced with their situation would exercise their right to foreclose.

However, plaintiffs' argument to price the mortgage at its face value ignores the reality that the Sheldens did not have a presently enforceable right to foreclose against the Washingtons when the government seized the Moraga property. This is apparent from the fact that the Sheldens were unable to foreclose against the Washingtons until February 23, 1987, after the Washingtons had exhausted their rights to cure under state law and the protections of bankruptcy were no longer available. Even though the Sheldens may have a good claim that the Washingtons violated the due on sale clause by pledging their interest in the property for their bail bonds, California state law provides that the mortgagor shall be granted a three month reinstatement period to cure and prevent foreclosure.

Simply valuing the mortgage at its face value ignores the reality that the Washingtons still retained a contingent interest in the property, *i.e.* if they were vindicated on appeal they could regain legal title. The contingent interest of the Washingtons and the circumstances surrounding this mortgage adversely affected the value of any mortgage tied to it, irrespective of the taking.

The corrected market comparable approach adopted by this court is cognizant of the discount that the market would supply when evaluating this mortgage as compared to other mortgages. The negative factors identified by Mr. Puccio that distinguished this mortgage from other owner-financed second mortgages, such as the Washington's criminal activity, would not be taken into consideration if this court simply accepted plaintiffs' arguments for valuing their mortgage at its face amount. If the court were to use the face value and ignore these factors, plaintiffs would receive some "windfall" because they would be guaranteed payment on a security whose value the day before the

government destroyed it was not guaranteed. *See United States v. Commodities Trading Corp.,* 339 U.S. 121, 130, 70 S.Ct. 547, 553, 94 L.Ed. 707 (1950) ("The general rule has been that the Government pays current market value for property taken, the price which could be obtained in a negotiated sale, whether the property had cost the owner more or less than that price ... [T]he Government [should not] be required to make good any losses caused by the fact that the owner purchased goods at a price higher than market value on the date of taking."). Since the corrected market comparable approach is a more accurate measure of the mortgage value at the time it was taken, it is the proper approach to determine the fair market value of the Sheldens' mortgage. In this case, of course, the difference between the two values is quite small. However, the correct valuation methodology might have more extensive consequences in other cases.

## II. The Credits to which the United States is Entitled

After finding the fair market value, the Federal Circuit directed the court to consider credits to the United States, such as the mortgage payments made by the Washingtons to the Sheldens after the property was taken by the United States. *Shelden,* 7 F.3d at 1031. The government argues that it is entitled to various credits based on the effect of foreclosure, mortgage payments received by the Sheldens, and an insurance recovery. In addition, both sides agree that the government is entitled to a credit for rental income and the Federal Circuit directed the court to provide a credit to the government for the fair market value of the property when it was deeded back to the Sheldens.

### A. The Effect of the Foreclosure

█ The government argues that under California's anti-deficiency statute, Cal.Civ. Proc.Code § 580b (West 1972 & Supp.1995), the effect of the foreclosure sale held on February 23, 1987, was to discharge the Sheldens' mortgage for the amount received at foreclosure. Under California's anti-deficiency statute, foreclosure extinguishes the mortgages on property and limits the mortgagee's right to recovery to the highest fore-

closure bid. The government asserts that under this approach, the Sheldens' right to recover for the taking of their mortgage would be limited by the amount paid at the foreclosure sale.

The Federal Circuit rejected this argument when it held that "[t]he taking of the Sheldens' property interest was effective on the day Washingtons' interest in the property was transferred to the United States and later events will not affect the government's liability." *Shelden,* 7 F.3d at 1028 n. 4. Furthermore, the Federal Circuit held that this attempted foreclosure was ineffective to transfer title and therefore a nullity in regard to the taking analysis: "Foreclosing against the Washingtons was actually a futile act because all their interest in the property had been transferred to the United States. Rather, the critical fact here is that the Sheldens could not enforce the mortgage against the United States after the property had been forfeited." *Id.* at 1028. Treating the foreclosure as a nullity is consistent with the Federal Circuit's finding that the Sheldens' mortgage was completely destroyed as of the date that the forfeiture was judicially ratified.

Although the Sheldens were the highest bidder at the foreclosure sale, with a bid of $115,000, their bid was based upon their mortgage interest in the property. The Sheldens did not pay out, nor receive any money at the foreclosure sale because they were entitled to bid on credit as their bid was less than the face value of their mortgage. The Sheldens did not actually receive effective title to the Moraga property at the foreclosure sale, even though they obtained possession and control. Since the government's approach attempts to reduce the government's liability because of the theoretical effect of a void foreclosure, it must be rejected as inconsistent with the Federal Circuit's conclusion that the taking was effective as of the date of forfeiture. Thus, this foreclosure is ineffective in regard to the taking that occurred here, and the government is not entitled to a credit arising from the foreclosure proceedings.

### B. Mortgage Payments

▮ The Federal Circuit held that the government is entitled to a credit for the mortgage payments paid by the Washingtons or on their behalf to the Sheldens after the mortgage was taken. Plaintiffs do not dispute the government's right to this credit. Thus, the government is entitled to a credit in the amount of $41,662.66 in mortgage payments paid to plaintiffs during the period from January, 1984 to February, 1986, and a credit for $4,845.82 representing three additional payments made on November 21, 1986, December 5, 1986, and January 23, 1987.

### C. Rental Value

#### 1. Profits

▮ Both sides agree that the government is entitled to a credit for the rental income the Sheldens received while the government was the owner of the property.[3] California law provides that a mortgagor is entitled to a credit for any rental income received by the mortgagee in possession. *Anglo–Californian Bank v. Field,* 154 Cal. 513, 98 P. 267, 268 (1908). The issue is whether the government is entitled to a credit representing only the rental profit realized by the Sheldens.

▮ The Sheldens believed that their foreclosure was effective, and that they were renting their own house. People generally attempt to realize the maximum return on their own property, which suggests that the Sheldens sought the maximum rent the market would allow. Certain expenses are necessary to realize profits from a rental property. Without these expenditures by the Sheldens there would be no rental profits for the government to claim. This court, therefore, finds that the actual profits made on the rent are the best measure of the rental credit due the government. The Sheldens bear the bur-

---

**3.** Although the Federal Circuit later found the foreclosure against the Washingtons' to be ineffective against the government, the Sheldens were still able to take possession of the Moraga house in February 1987. From August 1987— July 1989, the Sheldens rented the property to third parties, and then in August 1989, the Sheldens began to use the property as their principal residence, while they still rented rooms to boarders.

den of proving that each expense deducted was necessary for the production of rental income. Thus, this court finds that the amounts reasonably necessary to make the property rentable or in obtaining rent from the tenants, must be deducted as costs from any credit to the government.

■ This court finds that the following costs shall be subtracted from the gross rental income: amounts spent to make structural repairs; the $9,903.30 in repossession costs, such as costs associated with cleaning the house so that it could be legally rented; a reasonable management fee, which the court finds to be six percent of the actual gross rent; the costs associated with evicting delinquent tenants; and other out-of-pocket expenses necessary for the production of rent, identified by plaintiffs as "rental expenses."

### 2. Fair Rental Value

■ Plaintiffs concede that the government is entitled to the "fair rental value" of the property, which would require a credit for the fair market rental value during the time that the Sheldens used the property as their residence. Under the fair rental value approach, the government is entitled to a credit for the fair market rental value of the property while the Sheldens used it as their residence. The Sheldens claim that this fair market rental value is nominal at most because of the damaged condition of the residence.

The amount received as rent prior to the Sheldens' use of the property as a residence and the amount received from boarders while the Sheldens used the house as a residence demonstrate that the fair rental value was more than a nominal amount. However, the court finds that the government's figure of $1,500 per month is not credible considering the damaged condition of the house at the time at issue. A more accurate approach is to determine the fair rental value of the house during the period of time the Sheldens possessed the house as rental property.

■ Based on this approach, the court finds as an uncontroverted fact that the gross rental proceeds from 1987 through 1989 totalled $39,165. Considering testimony at trial, the court finds that the property was deteriorating and the gross rental proceeds reflect the "fair rental value of the property." The Sheldens had possession of the house while it was the government's property for forty-four months (February 1987—October 1990). The house was not rented from February 1987 through July 1987 while plaintiff made repairs to the property. Once plaintiffs rented the property, they received $36,765 in rental proceeds for twenty-four months (August 1987—July 1989). The remaining amount of rental proceeds, a total of $2400, was received in the first five months after plaintiffs began using the house as their residence.

The six months that the house could not be rented (February 1987—July 1987) and the twenty-four months plaintiff rented the property, while not using it as their residence, represent the thirty months the plaintiffs possessed the residence as rental property. Therefore, the court finds that, before discount, the monthly fair market value is $36,765 divided by thirty months which equals $1,225.50. The discount is in regards to the amount plaintiffs would have collected if renting the property to five students versus the amount they would have collected from a family of four. Discounting the monthly rent by twenty percent, the monthly fair market value while the Sheldens lived in the residence is $980.40. The "rental expenses" outlined *supra* are to be subtracted from the "fair rental value" of $980.40 per month while the Sheldens used the property as their residence.

### D. Insurance Proceeds

#### 1. California Insurance Law

■ On or about January 11, 1990, the Sheldens accepted a check from an insurance company for the sum of $64,469 in compromise of a larger claim for property damage sustained to the Moraga property during an earthquake on October 17, 1989. The government claims that it is entitled to a credit for these earthquake insurance proceeds. California insurance law defines the expectancies and nature of the property interest the parties have in any insurance proceeds. The relevant provision states:

neither the mortgagor nor mortgagee has any interest in the proceeds of insurance obtained by the other on his own separate interest. Thus, where a mortgagee procures insurance to protect his interest only, and the mortgagor is subject to no charge on account of the premium, any money received in payment of a loss will not be applied for the benefit of the mortgagor, but the mortgagee may receive and enjoy the insurance money and still collect the mortgage debt from the mortgagor. 39 Cal.Jur.3d, Insurance Contracts, § 485, (citations omitted).

This general rule traces its development to those cases in which a vendor who procures insurance for his own benefit is allowed to retain all the insurance proceeds, and the purchaser had no right to apply any part of the insurance proceeds towards the purchase price. *See White v. Gilman,* 138 Cal. 375, 71 P. 436, 437 (1903) (citations omitted). The application to other interests in property such as mortgages was first recognized by the Supreme Court of California in *Alexander v. Security–First Nat. Bank,* 7 Cal.2d 718, 62 P.2d 735 (1936). In *Alexander,* the Supreme Court of California held that the lessor was not entitled to separate insurance procured and paid for by the lessee. The court went on to state that "[t]he rule is the same between mortgagor and mortgagee" as neither "ordinarily has an interest in the proceeds of insurance obtained by the other on his separate insurable interest." *Id.* 62 P.2d at 737.

■ The first requirement to be met under the general rule is that the insured have a separate interest in the property. In *Alexander,* the California Supreme Court held that, "[d]ifferent persons may have separate insurable interests in the same property, as, for example, a mortgagor and a mortgagee." *Id.* The non-recourse nature of residential mortgages in California explains the need for allowing insurance by those with separate insurable interests. If a mortgaged California residence is destroyed, the mortgagor is not personally liable, while the mortgagee could suffer a total loss. Cal.Civ.Proc.Code § 580b (West 1972 & Supp.1995) (no deficiency judgment for purchase money mortgages). Thus in California, mortgagees have a separate insurable interest to protect them from such a loss. The plaintiffs' status as mortgagees provides them with an insurable interest in the Moraga property.

The second requirement is that the mortgagee protect his interest only. Unlike the requirement to maintain fire insurance, there was no obligation in the Deed of Trust for either party to procure earthquake insurance, so plaintiffs voluntarily procured the earthquake insurance. The Sheldens did not list the mortgagors as a loss payee. There is nothing in the record to suggest that the procurement of earthquake insurance was directly for the benefit of the mortgagor.[4]

The third requirement looks to whether the mortgagor paid or was charged with the premiums for the insurance. Plaintiffs paid the earthquake insurance themselves and did not charge the mortgagors for the premiums. Thus, plaintiffs appear to be covered by the general rule and entitled to retain the insurance proceeds and still collect on the underlying mortgage.

This general rule is based upon the theory that a mortgagor, who has no connection to the insurance, has no right to benefit from the proceeds. The apparent harshness of this general rule is ameliorated by two factors. First, California does not allow for deficiency judgments, or personal judgments beyond the property at issue. Cal.Civ.Proc. Code § 580b (West 1972 & Supp.1995). This means that vendees and mortgagors can "walk away" from the property after it has been damaged and leave vendors and mortgagees bearing the entire loss. Thus, in many cases, vendors and mortgagees do not obtain windfalls because their vendees and mortgagors surrender the property and avoid any further liability.

■ Second, the subrogation rights of the insurance company prevent a complete double recovery by the insured. For example, a

---

4. The fact that the check was made jointly payable to Santa Barbara Savings & Loan and its effect on the portion of the insurance proceeds that actually were paid to Santa Barbara is discussed *infra* at Part III.

federal district court applying California law concluded that a vendor is not entitled to a double recovery from both insurance and vendee when the entire subject matter of a personal sales contract is destroyed because the insurance company has subrogation rights to receive the vendee's payment. *In re Future Mf. Coop.*, 165 F.Supp. 111 (N.D.Cal.1958).[5]

### 2. The Government's Arguments

 The government asserts that the Deed of Trust operates as an agreement that provides that insurance proceeds received by the mortgagee should be credited to reduce the debt owed by the mortgagor. California insurance law provides that an agreement between the parties supersedes the general rule of individual recovery on separate insurable interests. However, the law further states:

Different persons may have separate insurable interests in the same property, as for example, vendor and vendee, mortgagor and mortgagee, owner and lienholder, lessor and lessee, or life tenant and remainderman. However, in the absence of an agreement to the contrary, none of the persons with insurable interests in the same property is entitled to the proceeds of insurance obtained by another on a separate insurable interest. *Long v. Keller*, 104 Cal.App.3d 312, 163 Cal.Rptr. 532 (1980) (quoting 39 Cal.Jur.3d, Insurance Contracts, § 485 (Supp.)).

At issue then is whether the Deed of Trust operates as an agreement that, superseding the general rule, allows insurance proceeds to be used for the mortgagor's benefit.

There are two provisions of the Deed of Trust that indicate that it may be an agreement contrary to the general rule. The first is the sentence that immediately follows the provision requiring the mortgagor to obtain fire insurance. It provides, "[t]he amount collected under fire or any other insurance policy may be applied by beneficiary upon indebtedness secured hereby." The second is a portion of paragraph six of the Deed of Trust, which concerns the mortgagee's right to require compensation to be used for the satisfaction of the mortgage debt. It provides, "[t]hat any award of damages ... [for] injury to said property or any part of thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance."

These two provisions in the Deed of Trust specifically provide that the mortgagee is entitled to insurance proceeds received by the mortgagor. Paragraph six's assignment of insurance proceeds, thus, appears to operate as a contrary agreement modifying the general rule. As the government notes in its Post–Trial Memorandum, however, paragraph six of the Deed of Trust protects the *mortgagee's* rights. This contrary agreement in the Deed of Trust is for the mortgagee's benefit, and the government has not shown that the Deed of Trust also operates in the reverse to assign proceeds received by the mortgagee to it, standing in the shoes of the mortgagor. Thus, the general rule applies and the government is not entitled to any credit from the insurance proceeds.

 The government argues that since the Federal Circuit held that the mortgage was taken on the date of forfeiture the Sheldens did not legally have a separate insurable interest in the Moraga property when the insurance proceeds became due. This argument is unpersuasive. Based on the government's argument, if a thief stole an insured car that thief would become the beneficiary of the car owner's insurance policy.

### 3. Collateral Source Rule

 The court need not reach this issue in light of the previous paragraphs. However, California's treatment of the collateral source rule further supports the position that no credit should go to the government for plaintiffs' insurance recovery. Plaintiffs ar-

---

**5.** Subrogation rights do not become enforceable in California until the insured receives all payments due or the entire subject matter of the insurance contract is destroyed. Here the earthquake insurance company may have subrogation rights that arise after the Sheldens receive payment for their mortgage.

gue that the government is not entitled to a credit for these insurance proceeds because of the collateral source rule. In *Helfend v. Southern California Rapid Transit,* 2 Cal.3d 1, 84 Cal.Rptr. 173, 178–79, 465 P.2d 61, 66–67 (1970), the California Supreme Court reaffirmed the collateral source rule, which provides that defendants are "not permitted to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance."

### 4. The Effect of Santa Barbara's Senior Mortgage

■ The Santa Barbara Savings & Loan held a senior, first mortgage on the Moraga property in the amount of $50,747 at the time of forfeiture. According to the testimony of Mary Shelden, about $44,000 of the insurance settlement was used to pay off Santa Barbara's first mortgage, and much of the remaining $20,000 was used for repairs to the Moraga house.

■ In *Russell v. Williams,* 58 Cal.2d 487, 24 Cal.Rptr. 859, 862, 374 P.2d 827, 830 (1962), the California Supreme Court suggested that if "equitable considerations" were present it is appropriate to consider sharing the proceeds of insurance with others who also have an interest covered by the policy. The main equitable considerations are whether the other parties not directly covered by the policy are protected by a loss payable provision. *Id.* Thus if in the mortgagor's insurance policy the mortgagee is listed as the person to whom the loss is payable, then the mortgagee has a superior right to the insurance proceeds and the mortgagor is entitled to a reduction in the outstanding debt.

In the case at bar, neither party has introduced as evidence a copy of the insurance contract. The fact that the insurance check was made payable to both the Sheldens and Santa Barbara, as a co-beneficiary, however, indicates that Santa Barbara was protected by a loss payable provision. It appears that

the Sheldens did not voluntarily choose to use the insurance proceeds to pay off Santa Barbara's senior mortgage, but instead were required, as a condition to obtaining Santa Barbara's agreement, to endorse the check. The Federal Circuit's decision indicates that the government was the owner as of the date of forfeiture, suggesting that Santa Barbara's mortgage was also taken like the Sheldens'. Since the senior debt was the government's sole responsibility as the owner of the property, the government was the ultimate beneficiary from the reduction in the senior mortgage. Therefore, the Sheldens should be compensated for this value taken by the government.[6] The value of the first mortgage, at the time of the taking, therefore, should be deducted from the credit to the government for the value of the property.

### E. The Value of the Property Quitclaimed by the United States

■ The Federal Circuit provided that the government is entitled to a credit for the fair market value of the Moraga property when the government surrendered it to the Sheldens by quitclaim deed on October 9, 1990. As previously discussed, fair market value is determined by examining the highest and best use of the property.

The testimony by the experts from both sides established that repairing the house was not the highest and best use of the Moraga property. The evidence indicated that the highest and best use for the Moraga property was to demolish the existing house, remove and replace the existing fill, and sell the property as a potential residential building lot. Ronald H. Kaminski, plaintiffs' real estate appraiser, testified that the value of the Moraga property as a potential residential building lot was $250,000 at the time it was turned over to the Sheldens. Defendant's real estate appraiser, Mr. Betts, testified that its value should be $220,000. Kaminski's estimate is based on an assumption

---

**6.** In the next section the government is awarded a credit for the value of the property at the time it was quitclaimed to the Sheldens. This valuation is higher than it would have been without a reduction or pay-off of the senior mortgage.

Therefore, the government received a benefit from the Sheldens' payment to reduce the senior mortgage, and this benefit must reduce the government's credit.

that the proper building permits would be issued for re-building. Based on the record this assumption was problematical. In addition, this court finds that the approach used by Mr. Betts is more credible because it is based upon a recognized valuation methodology, and therefore finds that the proper initial value for use as a building lot is $220,000.

When using similar properties as comparables to determine the fair market price, courts must correct for the specific attributes of the property at issue. For example, in *Bowles,* the court determined that the fair market value of a piece of property had to be computed by factoring in the ability to acquire an adjoining piece of waterfront, so that the highest and best use of the original property could be realized. *Bowles,* 31 Fed.Cl. at 47. The fair market value of the highest and best use as a vacant building lot must take into account certain adjustments to compensate for the fact that a damaged house currently exists on the property. Applying this rule to the instant case, the following expenses shall be deducted: the cost of tearing down and removing the house; the cost of grading and compacting the soil; and the reduction in value due to stigma associated with property that already had an erosion and earthquake damaged structure.

The government's appraiser, Mr. Betts, estimated that it would cost $10,000 to tear down and remove the house, and $20,000 to correctly grade and compact the soil to prepare the property for a new residence. Plaintiffs' professional engineer, John S. Pack, testified that it would cost $40,000 to both tear down the house and prepare the lot for a new residence. The court finds that Pack's testimony was more credible because it was based upon a more detailed examination of the costs associated with tearing down the house. Thus the court finds that $40,000 must be deducted from the value of the property to compensate for the costs associated with removing the damaged house and preparing the lot for a new residence.

This property is different from other potential building lots because it already has had a house built on it that was damaged. Any stigma associated with this property based on this history would result in a deduction in its fair market value. Under California's real estate disclosure law, Cal.Civ.Code § 1102.6 (West 1986 & Supp.1995), the seller of real estate must disclose this type of past history to all potential buyers. Plaintiffs claim that this stigma would diminish the value of the property by twenty percent. Defendant's expert, Mr. Betts, testified that it was his experience that there would be no negative stigma if the land were regraded to correct the problems with the soil. Alternatively, plaintiffs' experts testified that the stigma could be alleviated if the contractor regrading the soil guaranteed the work, but that this would cost between thirty and forty percent extra. This court finds that stigma would be taken into account by the market and that the proper reduction in value associated with stigma is the cost of obtaining a guarantee from the contractor that the regrading would be effective. The court finds this cost to be in the middle of the range supplied by plaintiffs' expert, thirty-five percent of the cost of regrading the soil. Thus, the value of $220,000 must be reduced by $54,000 ($40,000 plus 35%) to $166,000. The value of the first mortgage, which the Sheldens paid off to protect their property interest, also shall be deducted from the $166,000. Thus, the final credit to the government is $166,000 minus $50,747 or $115,253. By coincidence this is almost exactly the amount the Sheldens bid at the foreclosure sale. See discussion supra at section II(A).

### III. Fees and Expenses

After determining the issues of fair market value and credits due to the United States the court's next task is to determine fees and expenses, as well as any interest to be paid.

### A. Late Fees

The Sheldens paid late charges to Santa Barbara to protect their junior lien. They had an obligation to mitigate damages by paying on time. Therefore, the plaintiffs are not allowed to recover the late charges they paid to Santa Barbara.

### B. Expenses Related to Protecting Plaintiffs' Property Rights

#### 1. Statutory Provision for Fees

Pursuant to 42 U.S.C. § 4654(c) (1988), plaintiffs that prevail on takings

claims are entitled to reimbursement for their costs, expenses, and fees.

The court rendering a judgment for the plaintiff ... shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding. 42 U.S.C. § 4654(c).

Since the court has found that the property was appropriated, this section allows the Sheldens to recover the amounts pursuant to the statute. Under this section, however, plaintiffs have the burden of demonstrating that the amount meets the statutory requirements. The major issue is whether the fees and expenses associated with the invalid foreclosure sale in February 1987, and the Washingtons' bankruptcy hearing are recoverable.

■■■■ The Supreme Court has noted that the extent of the party's success is the most critical factor in a trial court's determination of the proper award of fees. *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Other courts have also addressed the issue: a party is entitled to recover all reasonable fees incurred in the process of litigation in which it ultimately prevails although the party may not have prevailed in every stage of the litigation. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1316 (9th Cir.) *cert. denied,* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). The court has some discretion in determining a reasonable award of fees and expenses. *See Branning v. United States,* 7 Cl.Ct. 777, 779 (1985). However, "[w]here the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1943, 76 L.Ed.2d at 40. Fees

and expenses incurred before the taking claim commenced, and those for duplicative legal services are not recoverable under this section. *Emeny v. United States,* 526 F.2d 1121, 1124, 526 F.2d 1121 (1975).

■■■■ In the case at bar, the plaintiffs were ultimately successful on their takings claim, which would provide that all of their reasonable fees and expenses incurred after their filing in the Claims Court are covered under 42 U.S.C. § 4654(c). The more difficult issue is whether the plaintiffs' fees and expenses associated with foreclosure and the bankruptcy proceeding are covered. Although plaintiffs' bankruptcy and foreclosure proceedings were successful in the California courts, the Federal Circuit disregarded this approach in its takings analysis. Since these proceedings occurred earlier, did not contribute to the ultimate finding of a taking, and were distinctly different, this court must conclude that the costs and fees associated with the bankruptcy and foreclosure sale were not actually incurred *because* of the proceedings in this court and thus are not recoverable under § 4654. Therefore, this court finds that only the expenses and fees incurred after filing in this court are recoverable under § 4654. Other earlier fees, however, may be recovered as a part of the property interest forfeited.

### 2. Expenses and Fees Pursuant to the Mortgage

■■■ The Sheldens assert that the United States is liable for their expenses related to the legal defense of their security interest and associated attorneys fees pursuant to the Deed of Trust. The note and Deed of Trust obligate the trustor to pay the Sheldens' attorney fees in "any action or proceeding purporting to affect the security" of beneficiary's interest, or "any suit brought by Beneficiary to foreclose this Deed," or any "action ... instituted on this note." [7] The Deed of Trust also requires reimbursement of "all costs and expenses, including the cost of

---

7. Pls.['] Initial Post–Trial Brief on the Issue of Just Compensation at 13 (quoting the Deed of Trust, ¶ 3).

evidence of title"[8] incurred by the Sheldens in connection with such litigation.

When it takes property by forfeiture, "the government can succeed to no greater interest in the property than that which belonged to the wrongdoer whose actions have justified seizure ... The forfeiture cannot change the nature of [the] rights [of] an innocent mortgagee [unless it] pay[s] the entire mortgage debt." *In re Metmor Fin. Inc.*, 819 F.2d 446, 448 (4th Cir.1987) (quoting *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 579 n. 7, 55 S.Ct. 854, 858 n. 7, 79 L.Ed. 1593 (1935)). Although the mortgage in the case at bar was taken when its underlying property was forfeited to the government, this forfeiture did not arise under the same statute that provided innocent landowner protections that the court in *Metmor* relied upon. Nevertheless, the Federal Circuit cited approvingly to *Metmor*, and noted that "[a] forfeiture under the Comprehensive Drug Abuse Prevention and Control Act is similar to a forfeiture under RICO for a takings analysis which applies constitutional rather than statutory principles." *Shelden*, 7 F.3d at 1029 n. 6.

The court in *Metmor* specifically held that plaintiffs whose mortgages are taken without compensation, after forfeiture of the underlying property, are entitled to post-seizure interest. The *Metmor* court went on to note in a footnote that the plaintiff in *Metmor* "also sought to recover its costs and attorneys' fees expended in recovering its property. Had this been provided for in the mortgage agreement, such expenses would be a part of Metmor's property interest, to which it would be entitled." *Metmor*, 819 F.2d 446 at 448 n. 3. This reasoning comports with the overall rationale adopted in *Metmor*, that the government steps into the shoes of the property owner whose property it seizes by forfeiture, and assumes the duties and limitations that define the property interests it has obtained. Although the Federal Circuit did not specifically adopt this overall rationale, this court finds it persuasive and consistent with how takings law defines the property interest obtained by the government when it seizes property subject to a mortgage.

In another innocent landowner case, *United States v. Real Prop. Located at 41741 Nat. Trails Way*, 989 F.2d 1089, 1090 (9th Cir. 1993), a court rejected the government's argument that the vesting of title in the government precludes an agreement in the Deed of Trust providing for the recovery of costs from operating. The Ninth Circuit held, "that if the right to recover attorneys fees and costs is secured by the property, the innocent lienholder's right to recover such fees and costs is created when the deed of trust is formed and constitutes an 'interest' in property." *Id.* at 1092; *see also United States v. Real Property Located at 2471 Venus Drive*, 949 F.2d 374, 377 (10th Cir.1991) (holding that the plaintiff's right to recover attorney's fees was effective "as of the date of the act of forfeiture even though the actual expenditure of attorney's fees would not occur until later when forfeiture proceedings commenced."); *United States v. Six Parcels of Real Prop. Situated in Blount Co. Tenn.*, 920 F.2d 798 (11th Cir.1991). This court finds this reasoning persuasive because it enforces plaintiffs' property rights in having their security protected as provided in the agreements that define these property rights. Therefore, the United States is bound to pay the expenses and costs as provided in the Deed of Trust. Thus, while these expenses and fees are not recoverable under 42 U.S.C. § 4654(c),[9] the expenses are recoverable as a property interest that was taken by the government in this case.

Applying this reasoning to the case at bar suggests that the government may be liable for some of the Sheldens' expenses and costs. According to their Deed of Trust, the Sheldens, as the trustee or beneficiary, are entitled to have the costs, fees, and interest associated with protecting their property rights under the Deed of Trust paid by the trustor.[10] The right to have these expenses

---

8. *Id.*

9. *See supra* part III(B)(1).

10. The Sheldens' Deed of Trust provides that they as trustee or beneficiary are authorized to: appear in and defend any action or proceeding purporting to affect the security hereof or the

paid is a property right that the Sheldens had in their mortgage. Unlike *Metmor*, the right to have expenses reimbursed *is* part of the Deed of Trust in the case at bar. The Deed of Trust defines property rights in the forfeited property.[11]

The government argues that the cases limit the right of recovery to the time between seizure and eventual judicial determination of the ownership of the property, and do not contemplate costs or expenses incurred after the title to the property has been transferred to the government. In *Metmor*, however, the court held that the plaintiffs were "entitled to collect post-seizure interest on its mortgage, until the time when the property is eventually sold," and "that the innocent owner is entitled to receive such payments from the government, even after the property has been seized, until the principal is repaid." *Metmor*, 819 F.2d at 448, 451. The reasoning in *Metmor* suggests that recovery of fees and expenses would be limited to the time at which forfeiture is decreed. This reasoning reflects that the government's obligation would be extinguished when it sold its interest in the forfeited property and title was transferred to a buyer, because this new buyer would necessarily pay off the lienholders in full at the time of closing.

The situation contemplated in *Metmor*, however, is a far cry from what occurred in the instant case, because of the long period between forfeiture and the payment of compensation to the innocent mortgagees. Under the rationale in *Metmor*, the Sheldens are entitled to receive payments for expenses and costs until such time as the property is sold or the principal has been repaid. It is immaterial that the expenses and costs were actually incurred sometime after the forfeiture, as long as the costs and expenses were necessary to protect the Sheldens' property interest. If so, the costs are compensable.

Mindful of the actual circumstances of this case and the novel issues it presents, the court finds that expenses and costs that were engaged in good faith and substantially related to protecting the Sheldens' property interest were necessary. Under this view, the expenses and costs associated with the foreclosures, the bankruptcy proceeding, and prosecuting this takings claim are plainly recoverable.

### 3. Obligations under the Covenants in the Deed of Trust

#### i. Repair & Fire Insurance

The plaintiffs seek to recover for the failure of the United States to perform repair and maintenance of the improvements on the Moraga property. Paragraph one of the Deed of Trust provides:

> To keep said property in good condition and repair; ... to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged, or destroyed thereon ... not to commit or permit waste thereof; ... to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the

rights or powers of Beneficiary or Trustee; pay, purchase, contract, or compromise and encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all costs, fees and expenses of this Trust. [and that trustor (mortgagor) agrees to] pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from the date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time said statement is demanded. Pls.['] Initial Post–Trial Brief on the Issue of Just Compensation at 15 (quoting the Deed of Trust, ¶ 5).

11. One could consider the property right to receive costs and expenses as merely a component of the value of the underlying mortgage that was taken by the government. However, neither party made this argument and there was no evidence introduced on how to value this component. Although this may be a more logical way in which to conceive of takings in the abstract, for the court to set a market value on this strand of the Sheldens' property rights, at the time of the taking, would be highly speculative in light of the history of this case. It is far more fair and rational to value this right as it came due.

general. Pls.['] Initial Post–Trial Brief on the Issue of Just Compensation at 12 (quoting the Deed of Trust, ¶ 1).

The Sheldens also claim that the United States is liable for the maintenance of a fire insurance policy covering the mortgagees as loss payee on the Moraga property. Paragraph two of the Deed of Trust requires the Trustor "[t]o provide, maintain and deliver to beneficiary fire insurance satisfactory to and with loss payable to beneficiary."

The evidence showed that the United States did not maintain the property by performing regular maintenance and repairing damage from the earthquake. After forfeiture, the United States did not maintain a fire insurance policy, and the Sheldens began paying the fire insurance premiums. Thus the United States did not comply with the obligations of the mortgagor in the Deed of Trust.

> The Federal Circuit cautioned that:
> [w]hether or not the United States negligently maintained the property after obtaining Washington's interest in the property is irrelevant to determining the liability of the government. The taking of the Sheldens' property interest was effective on the day Washingtons' interest in the property was transferred to the United States and later events will not affect the government's liability. *Shelden*, 7 F.3d at 1028 n. 4.

Damage to the improvements is irrelevant because the Sheldens would be compensated for the full value of their property interest even if the improvements were destroyed. Thus, only the repairs and maintenance necessary for the rental of the property and actually paid by the Sheldens are recoverable as discussed *infra*. The court concludes that the government is not liable under the Deed of Trust's obligations to repair and maintain the Moraga property. Any such loss already falls upon the government, as a reduction in fair market value of the property, and hence a reduction in the government's credit.

The Sheldens argue that the government will be unjustly enriched by the benefit of having fire insurance protect its interest in the Moraga property. The court emphasizes that under California law, both the government and the Sheldens had a separate insurable interest in the Moraga property. In light of these considerations, this court finds that the government is not liable for the fire insurance premiums.

*ii. Mortgage Payments to Santa Barbara*

Plaintiffs argue that they should be reimbursed for the regular mortgage payments they made to Santa Barbara to protect their junior mortgage. According to the Sheldens, paragraph four of the Deed of Trust obligates the trustor, which the United States became: "To pay ... when due, all incumberances, charges, and liens, with interest, on said property or any part thereof, which appear prior or superior hereto; ...." Pls.['] Initial Post–Trial Brief on the Issue of Just Compensation at 14 (quoting the Deed of Trust, ¶ 4). Clearly, based on the Federal Circuit's reasoning, the government took the Sheldens' security interest in the property "[w]hen the forfeiture order transferred all of the Washington's interest in the property to the United States." *Shelden*, 7 F.3d at 1026. After that time, the government was responsible under the Deed of Trust to pay the senior mortgage. The government did not pay. The Sheldens did pay. The government is liable to the Sheldens for any payments the Sheldens made on the senior mortgage while the property was owned by the government. This value, however, is accounted for as a reduction in the government's credit for the value of the property.[12] Thus, the entire amount of the first mortgage, which was paid off by the Sheldens during this period, shall be deducted from the government's credit.

**IV. Interest**

To provide the full value of the property taken, just compensation includes interest on the property, expenses and fees. Interest for these expenses and fees is to be computed at compound interest rates because there has been a substantial time period between appropriation and compensation.

12. *See supra* part II(E).

*Whitney Benefits,* 30 Fed.Cl. at 413. Owners of property taken by the government are entitled to interest from the date the taking became effective until paid by the government. *Id.* at 411. Applying this rule, the plaintiffs are entitled to interest as of the date the forfeiture became effective until the date the government tenders final payment consistent with this opinion.

■ The rate of interest is determined by examining the rate of interest provided for in the financial instrument that was taken. If the instrument itself is not determinative, the rate of interest is determined by examining the fair market rate on other comparable financial instruments. The note provides that the rate of interest on the mortgage principal was to be 10.5 percent "until June 1, 1986, at which time the unpaid principal and interest, then due, shall become payable in full. Beneficiary and Trustor may have the option to renegotiate at the end of the seven year period, allowing the Trustor to continue said Note for an additional five year period." The Sheldens' note provides that the rate of interest to be assessed through June 1, 1986, was 10.5 percent.

■ The government argues that the judgment rate should apply for the period beyond the term of the note. California law provides that the judgment rate of 7 percent shall used in the absence of an agreement as to the interest rate that may be charged. *In re Estreito,* 111 B.R. 294 (9th Cir. BAP 1990). There was no agreement between the government and the Sheldens concerning the applicable interest rate for the period after June 1, 1986. Using the judgment rate for this entire period after June 1, 1986, however, does not fully compensate the Sheldens. The limit to the judgment rate makes sense only in those cases in which plaintiffs, who are unable to secure agreement about an interest rate, are thus forced to sue on the agreement or foreclose on the mortgage and convert their property interest into a judgment. The instant case did not arise because of a failure to agree on a future interest rate, instead the government appropriated the Sheldens' property. Thus the court finds that the rationale for employing the judgment rate is inapplicable here. Since neither party introduced evidence on the fair market interest rate for comparable mortgage notes, the court finds that the Contract Dispute Act (CDA), 41 U.S.C. § 611, rate for the time period in question is appropriate. *Whitney Benefits, Inc.,* 30 Fed.Cl. at 416.

■ Compound interest is appropriate when there has been a substantial time period between appropriation and compensation. Awarding compound interest comports with the goal of making the plaintiff whole: "the owner is entitled to interest thereon *sufficient* to insure that he is placed in as good a position pecuniarily as he would have occupied if payment had coincided with the appropriation." *Whitney Benefits,* 30 Fed. Cl. at 413 (quoting with emphasis supplied from *Kirby Forest Indus. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984)). Since the appropriation in this case occurred on January 24, 1984, an award of compound interest is appropriate. The argument that compound interest is inappropriate for this residential property ignores the investment nature of the Sheldens' interest in the note that was appropriated. It also creates an unwarranted discrimination between property held for investment and property held for consumption. In real life, property is held for various reasons. Most homes are held for living in and as an investment. Therefore, a single rule for both residential and investment or commercial property is appropriate and more logical. *See Bowles,* 31 Fed.Cl. 37.

## CONCLUSION

The court recognizes that the parties have filed voluminous documentation and disputed the specific amount of damages, fees, expenses, and costs that the government must reimburse Sheldens, as well as the costs that the Sheldens must credit the government. The court hopes that this opinion answers the remaining issues such that the parties are able to agree on the precise amount due plaintiffs.

To encourage this result, the court orders the parties to file a joint stipulation, within sixty days, of the exact amount to be entered as the judgment of the court. If the parties

cannot agree on such an amount within this time period, each party shall file a separate tabulation of the amount, within the same sixty days, based upon the points set out in this opinion. The court then will hold a brief hearing to resolve any disputes, if necessary. IT IS SO ORDERED.