**Carl and Mary SHELDEN, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

**No. 92–5154.**

United States Court of Appeals, Federal Circuit.

Oct. 15, 1993.

---

**1024**

Brenda Grantland, Mill Valley, CA, argued for plaintiffs-appellants. With her on the brief was Landon Dowdey, Washington, DC, of counsel.

Evelyn S. Ying, Atty., Dept. of Justice, Washington, DC, argued for defendant-appellee. With her on the brief were Myles E. Flint, Acting Asst. Atty. Gen., Jacques B. Gelin and David L. Shuey, Attys.

Before MAYER, MICHEL and LOURIE, Circuit Judges.

MICHEL, Circuit Judge.

Carl and Mary Shelden appeal from the June 24, 1992 decision of the United States Claims Court,[1] *Shelden v. United States,* 26 Cl.Ct. 375 (1992) (*Shelden II*), vacating the same court's January 12, 1990 decision, *Shelden v. United States,* 19 Cl.Ct. 247 (1990) (*Shelden I*). In *Shelden II* the Claims Court held that the Sheldens, as mortgagees of property forfeited to the United States, suffered no taking by the government that would be compensable under the Fifth Amendment. Because the United States took a well-recognized property right held by the Sheldens when it acquired the mortgagor's interest in the forfeited property, we reverse and remand for a determination of just compensation.

## I. BACKGROUND

Appellants Carl and Mary Shelden sold real property located in Moraga, California, to Ralph and Freddie Washington in May, 1979, secured by a deed of trust. The note contained a "due on sale" clause which gave the Sheldens the right to declare the mortgage balance immediately due and payable if "the Beneficiary, [Washington] sells, agrees

to sell, transfers or conveys its interest in the real property or any part thereof or any interest therein." On February 15, 1983, the Washingtons were indicted for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.* (1982). The indictment alleged that the Moraga property was subject to forfeiture under RICO.

On October 7, 1983, with the note held by the Sheldens $6264 in arrears, the Sheldens' trustee filed a notice of default and election to sell the Moraga property. The Sheldens intended to sell the property at a foreclosure sale in January, 1984, following expiration of the three month reinstatement period required under California law to allow the defaulting party to cure. Cal.Civ.Code §§ 2924, 2924c (West 1993). Prior to the foreclosure date, however, the Washingtons' attorney incorrectly informed the Sheldens that their foreclosure agent had improperly recorded the notice of default. Consequently, the trustee re-recorded the notice of default and postponed the foreclosure sale until April 10, 1984.

On December 1, 1983, a jury found Ralph Washington guilty of RICO violations and declared all his properties, including the Moraga property, forfeited pursuant to 18 U.S.C. § 1963. The government filed a notice of *lis pendens* on December 9, 1983, reciting the jury verdict and declaration of forfeiture. The district court entered an "Order re Forfeiture of Properties and Disposition Thereof Pending Appeal" on January 31, 1984. The order provided that Washington's interest in the properties was transferred to the United States, but that record title would remain in Washington's name, pending appeal. The order, as it applied to the Moraga property, stated:

3. Any and all interest of the defendant Ralph Huey Washington in and to the aforesaid real properties is hereby deemed transferred to plaintiff United States of America effective January 20, 1984, although for the convenience of the parties

---

1. As of October 29, 1992, the United States Claims Court became the "United States Court of Federal Claims," pursuant to Title IX of the Federal Courts Administration Act of 1992,

Pub.L. No. 102–572, 106 Stat. 4506. Since all proceedings in the trial court were completed before the statute changed the court's name, we refer to it throughout by its former name.

and to put into effect the terms of this order[,] record title to the properties shall remain, (where applicable) in the name of Ralph Huey Washington.

.    .    .    .    .

5. (A) Defendant Ralph Huey Washington, or his designated representative, shall be entitled to remain in physical possession of, and to have the management and control of, the following parcels of real property: [the Moraga property]

(B) Defendant, so long as he is not in custody, shall be entitled to reside in [the Moraga property]; in the event that said defendant is in custody, said real property shall be rented at a commercially reasonable rental, on a month to month basis.

.    .    .    .    .

11. Upon final disposition of defendant's appeal, the property declared forfeitable shall forthwith be irrevocably vested in plaintiff United States of America, or released to defendant Ralph Huey Washington, as the result of said appeal shall indicate.

In an attempt to prevent the Sheldens' scheduled foreclosure in April, 1984, the United States and the Washingtons intervened before the district court which had presided over the RICO proceedings. The district court mediated a stipulated one month postponement of the foreclosure sale. The Washingtons avoided the May, 1984 foreclosure sale by paying arrearages on the mortgage.

The Sheldens filed another notice of default in April, 1986, stating that the Washingtons were again in arrears on their mortgage payments. Because the Washingtons did not cure during the three month reinstatement period, a foreclosure sale was noticed for August 20, 1986. However, a few hours before the sale was to occur, the Washingtons filed for protection under Chapter 11 of the bankruptcy code. The property was placed under the bankruptcy court's jurisdiction and, as a result, the foreclosure sale did not take place at that time.

During proceedings in the bankruptcy court, the Sheldens learned that the hill supporting the house on the Moraga property had eroded badly since the time the property had been forfeited to the United States, causing structural and cosmetic damage to the house. The Sheldens claim that the property which was appraised at $325,000 in 1983 was worth only $60,000 by early 1987. Because no equity remained in the property, the bankruptcy court released it from the bankruptcy estate. The Sheldens noticed a foreclosure sale for February 23, 1987 at which they bought the Moraga property for $115,500.

On August 20, 1986, the same day that the Washingtons filed for bankruptcy, the Court of Appeals for the Ninth Circuit vacated Ralph Washington's conviction and remanded the case. *United States v. Washington,* 797 F.2d 1461 (9th Cir.1986). On September 26, 1988, however, Washington entered a guilty plea which forfeited the Moraga property to the United States even though the Sheldens had already foreclosed on and bought the property. Between the time of the appellate decision and Washington's guilty plea, the trial judge who had entered the forfeiture order had never ruled on whether the Ninth Circuit's decision vacating Washington's conviction affected the forfeiture verdicts; nor did he ever vacate the forfeiture judgment as to the Moraga property. Not until the summer of 1990 did the Sheldens learn that Washington's guilty plea irrevocably vested title to the Moraga property in the United States. However, the government gave the Sheldens a quitclaim deed and a release of the *lis pendens* on October 9, 1990.

On March 11, 1988, the Sheldens filed a complaint in the Claims Court, alleging that the government's actions effected an uncompensated taking of their property in violation of the Fifth Amendment. They sought compensation for the diminution of the value of the Moraga property caused by the erosion occurring after the forfeiture based on Washington's December 1, 1983 conviction.

On cross motions for summary judgment on the issue of liability, the Claims Court held that the government had taken the Sheldens' property without just compensation. *Shelden I,* 19 Cl.Ct. 247. The court concluded that the government's filing of the notice

of *lis pendens* "announced to the world that the United States had a lien on the property, and it effectively destroyed the value of the Sheldens' security interest." This amounted to a taking. *Id.* at 252. A trial was set to determine damages.

On August 9, 1990, the United States filed a motion for relief from the Claims Court's decision under R.U.S.C.C. 60(b)(2), alleging newly discovered facts that undermined the basis of the court's determination of liability. The court vacated *Shelden I* and granted the government's motion for summary judgment or, in the alternative, granted the government's motion for relief and dismissed the case. The court held that because the Sheldens failed to show any actual damage suffered as a result of the government's placing a notice of *lis pendens* on the property, there was no taking. *Shelden II*, 26 Cl.Ct. 375. The court reasoned that the government's actions never prevented the Sheldens from foreclosing. They were prevented by the Washingtons' curing their default on the mortgage and by the declaration of bankruptcy. *Id.* at 380.

The Sheldens appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (1988).

## II. STANDARD OF REVIEW

■ We review Claims Court decisions *de novo* for errors of law and for clear error on findings of fact. *Yancey v. United States*, 915 F.2d 1534, 1537 (Fed.Cir.1990). The parties do not dispute the facts of this case. Therefore, the only issue on appeal is whether the government's actions amount to a compensable taking. Because the Claims Court decided liability as a matter of law by granting the government's motions to dismiss and for summary judgment, our standard of review is *de novo*. *Turner v. United States*, 901 F.2d 1093, 1095 (Fed.Cir.1990) ("We review the grant of summary judgment motions by the Claims Court *de novo*.").

## III. ANALYSIS

■ The Fifth Amendment to the United States Constitution provides in part, "nor shall private property be taken for public use, without just compensation." The purpose of the "takings clause" is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). When the forfeiture order transferred all of Washington's interest in the property to the United States, the government took a property interest from the Sheldens for a public purpose. *See Shelden I*, 19 Cl.Ct. at 253 ("*in personam* forfeitures serve the public's interests in enforcing penal sanctions"). In accordance with the principles of the Fifth Amendment, the Sheldens must be compensated.

### A. Compensable Property Interest

The situation here is analogous to that in *Armstrong*. The plaintiffs in that case held materialmen's liens under state law, enforceable only by attachment, on property furnished to a government contractor. When the contractor defaulted on its contract with the United States, the government required the contractor to transfer the property in question to the United States. *Id.*, 364 U.S. at 41, 80 S.Ct. at 1565. Even though the plaintiffs in *Armstrong* did not actually attach the materials in question, they were entitled under their lien to resort to the specific materials for the satisfaction of their claims. The Court held that the plaintiffs' rights under the liens constituted a compensable property interest under the Fifth Amendment. *Id.* at 44, 80 S.Ct. at 1566.

■ There is no difference, for Fifth Amendment purposes, between a mortgage lien and the materialmen's liens at issue in *Armstrong*. *Murray v. United States*, 817 F.2d 1580, 1583–84 (Fed.Cir.1987). A mortgagee's lien, such as that held by the Sheldens, is also a compensable property interest within the meaning of the Fifth Amendment. *Id.* at 1583 (citing *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602, 55 S.Ct. 854, 869, 79 L.Ed. 1593 (1935)).

### B. The Taking of the Sheldens' Mortgage Interest

The 1970 RICO statute applicable when Washington was convicted stated, "Upon con-

viction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper." 18 U.S.C. § 1963(c) (1982).[2] In accordance with the RICO statute, after entry of the jury verdict, the court authorized the Attorney General to seize the Moraga property, 18 U.S.C. § 1963(c), for the district court was obliged to order all the defendant's property interest that was named in the jury verdict forfeited. *United States v. Godoy*, 678 F.2d 84, 88 (9th Cir.1982), *cert. denied*, 464 U.S. 959, 104 S.Ct. 390, 78 L.Ed.2d 334 (1983).[3]

Title to the Moraga property was effectively transferred to the United States on January 20, 1984, the operative date of the "Order re Forfeiture of Properties and Disposition Thereof Pending Appeal" that the district court entered on January 31, 1984 based on the jury's verdict of forfeiture. The forfeiture order states that "[a]ny and all interest of the defendant Ralph Huey Washington in and to the [Moraga property] is hereby deemed transferred to plaintiff United States of America effective January 20, 1984."

■■ Title to forfeited property transfers to the United States upon entry of a judgment of forfeiture. *See United States v. Stowell*, 133 U.S. 1, 17, 10 S.Ct. 244, 247, 33 L.Ed. 555 (1890) (the government's "title is not perfected until judicial condemnation"); *United States v. A Parcel of Land, Buildings, Appurtenances and Improvements Known as 92 Buena Vista Ave., Rumson, N.J.,* —— U.S. ——, ——, 113 S.Ct. 1126, 1136, 122 L.Ed.2d 469 (1993) ("If the government wins a judgment of forfeiture under the common law rule ... the vesting of its title in the property relates back to the moment

when the property became forfeitable. Until the government does win such a judgment, however, someone else owns the property."). Thus, when the district court entered judgment (the forfeiture order), title to the Moraga property was effectively transferred from Washington to the United States. Although the government allowed Washington to retain record title, live in and manage the Moraga property during the appeals process, the statute, the cases describing forfeiture and the forfeiture order itself make clear that the United States succeeded to all of Washington's interest in the property as of January 20, 1984. The *lis pendens* made this public. The United States had ownership of, and, therefore, held title to the Moraga property even though it allowed Washington to . retain record title for the convenience of the parties.

In deciding whether the Sheldens' demonstrably compensable property interest was taken when title to the Moraga property was effectively transferred to the United States, it is again helpful to look to *Armstrong*. After the materials at issue in *Armstrong* were transferred to the United States the plaintiffs could not enforce their liens due to the sovereign immunity of the government, even though the liens remained technically valid. *Armstrong*, 364 U.S. at 46, 80 S.Ct. at 1567. Thus, transfer to the United States altered not the lien itself, but its enforceability. Because the liens were no longer enforceable, their value had been destroyed, which constituted a taking entitling the plaintiffs to just compensation. *Id.* at 48–49, 80 S.Ct. at 1568–69.

The precedent of this court further supports the rule that when the government destroys the value of a mortgage, the mortgagee has suffered a taking and must be

---

2. Section 1963 of the RICO statute was amended in 1984, 1986, 1988 and 1990 but the relevant provisions remain similar. 18 U.S.C. § 1963 (1988 & Supp. IV 1992). Under the current statute subsection (e) states "Upon conviction of a person under this section, the court shall enter a judgment of forfeiture of the property to the United States and shall also authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper." 18 U.S.C. § 1963(e).

3. At the time of Washington's conviction it was clear in the Ninth Circuit (where Washington was convicted) that the forfeiture provisions of 18 U.S.C. § 1963(a) were mandatory. Upon a jury's determination that a defendant has violated the RICO statute and that his interest in certain properties had been acquired or maintained in violation of RICO, the forfeiture provisions of 18 U.S.C. § 1963 are triggered and the district court is obliged to order forfeiture of those properties. *Godoy*, 678 F.2d at 88.

compensated. In *Murray,* the IRS foreclosed tax liens on real property and refused to permit the mortgage holder to redeem mortgaged property. We held that the refusal destroyed the value of the mortgage and resulted in a compensable taking. *Murray,* 817 F.2d at 1583–84.

■ As in *Armstrong,* after the Moraga property was transferred to the United States the mortgage could not be enforced against the government due to the its sovereign immunity. In addition, depending on the outcome of *Washington's* appeal, the property might irrevocably vest in the United States according to the forfeiture order, as in fact happened. The institution of any foreclosure proceedings by the Sheldens would obviously interfere with the United States' right as the title holder to possess and control the property pending the outcome of *Washington's* appeal. Because the mortgage was no longer enforceable, its value had been destroyed, resulting in a taking of the Sheldens' property interest in the mortgage.[4]

### C. The Claims Court Decision

The Claims Court characterized *Armstrong* as holding that the plaintiffs' property rights were destroyed and the plaintiffs were actually damaged by the government's actions. The court contrasted *Armstrong* with the Sheldens' situation in which it concluded that the government's filing of the notice of *lis pendens* never prevented the Sheldens from foreclosing. *Shelden II,* 26 Cl.Ct. at 380. The Claims Court explained that:

> Under state law, [the Sheldens] had the right to foreclose only if the Washingtons failed to cure. Even if the government's filing of the *lis pendens* could have prevented [the Sheldens] from foreclosing on their property, the fact that the Washingtons were able to cure their defaults prior to the foreclosure sale leads to the conclusion that [the Sheldens] never had the right to foreclose. The one time that the

Washingtons did fail to cure their default, the property was seized by the bankruptcy court prior to the actual foreclosure sale. *Id.* Because the Sheldens never had the right to foreclose, the government could not take that right from them. Therefore, the Claims Court concluded that they had not suffered a taking compensable under the Fifth Amendment. *Id.*

The Claims Court's analysis misidentifies the critical fact of this case. The critical fact is not that the Sheldens could not foreclose against the Washingtons due to the operation of state law. Foreclosing against the Washingtons was actually a futile act because all their interest in the property had been transferred to the United States. Rather, the critical fact here is that the Sheldens could not enforce the mortgage against the United States after the property was forfeited.

The Claims Court also discounted the Sheldens' argument that their right to foreclose on the Moraga property was taken when the district court ordered the property forfeited under RICO. The Claims Court held that no taking had occurred because the Sheldens did not attempt to foreclose prior to August, 1986 and thus were not prevented from foreclosing by any governmental action. *Id.* at 381. However, the Sheldens are not required to foreclose against the United States before the court can hold that a taking has occurred. The Supreme Court found a compensable taking in *Armstrong* even though the plaintiffs had never attached the property in question. 364 U.S. at 44, 48, 80 S.Ct. at 1566, 1568. Therefore, no such foreclosure attempt is required here.

### D. The Government's Arguments

The government argues that there was no taking because the Sheldens' secured interest in the Moraga property was recognized by the government and left intact. The government attempts to distinguish *Armstrong* by arguing that unlike the lienholders in *Armstrong,* the Sheldens were given the opportu-

---

4. Whether or not the United States negligently maintained the property after obtaining Washington's interest in the property is irrelevant to determining the liability of the government. The taking of the Sheldens' property interest was effective on the day Washington's interest in the property was transferred to the United States and later events will not affect the government's liability.

nity and means to protect and recover their mortgage interests. Even after Washington's interest in the Moraga property was forfeited to the government, the Sheldens retained their right to receive mortgage payments under their note, the right to resort to the district court for protection and the right ultimately to foreclose on the property, according to the government. The government contends that the fact that the foreclosure eventually succeeded when state and bankruptcy laws allowed it shows that the United States took no property interest from the Sheldens.

The government's argument assumes that the Sheldens maintained the right to foreclose against the Washingtons and, therefore, lost none of their rights as mortgage holders. A similar argument was rejected in *In re Metmor Financial, Inc.,* 819 F.2d 446 (4th Cir.1987). In that case Metmor, an innocent mortgage holder, challenged a district court forfeiture order rendered pursuant to the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 881 (1978). The district court refused to require the government to pay interest on the mortgage for the time period between the seizure of the property and its final sale. *Metmor,* 819 F.2d at 447.

In reversing the district court order and awarding interest payments to Metmor, the Fourth Circuit rejected the government's argument that Metmor's mortgage rights had not been impaired because it could turn to the mortgagor for interest payments. Requiring Metmor to look to the mortgagor would "transform Metmor from a secured creditor to an unsecured creditor. As the Court in *Armstrong* noted, the government cannot 'deprive mortgagees of substantial incidents of their rights to resort to mortgaged property.'" *Id.* at 451. In *Metmor* as in *Armstrong,* transfer to the government destroyed the enforceability of the mortgage due to the government's sovereign immunity, meaning that any debt against the mortgagor was unsecured. *Id.* at 450–51. The transfer entitled Metmor to just compensation under the Fifth Amendment. *Id.* at 450.[5]

■ Although a different statute was involved, we find the reasoning in *Metmor* persuasive here.[6] By requiring that the Sheldens look to Washington for mortgage payments and redemption, the United States turned the Sheldens into unsecured creditors who must be compensated for the taking of their property interest in the mortgage. The fact that the Sheldens instituted foreclosure proceedings several times and completed those proceedings only in February, 1987 was due to a mistaken understanding of the law held by the government attorneys and the district court judge involved in the forfeiture proceedings. The Sheldens could not validly foreclose against the Washingtons because their interest in the Moraga property had been transferred to the United States by the judgment of forfeiture. As a result, the Washingtons' debt to the Sheldens was no longer secured by the value of the Moraga property.

■■ Even though the United States consented to relinquish its interest by delivering a quitclaim deed to the Sheldens so that the Sheldens eventually held clear title after the · foreclosure, this event does not affect whether the original forfeiture judgment constituted a taking. The authorities are clear that forfeiture of mortgaged property results in a taking from the mortgage holder at the time of forfeiture, when title is transferred to the United States. *Armstrong,* 364 U.S. at 46, 80 S.Ct. at 1567 ("After transfer to the United States the liens ... could not be enforced because of

---

5. *Metmor*'s holding that lienholders have a compensable property right has been followed by every court of appeals considering the rights of innocent lienholders in property forfeited under the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 881. *United States v. One Urban Lot Located at 1 Street A–1,* 865 F.2d 427, 430 (1st Cir.1989); *United States v. Six Parcels of Real Property,* 920 F.2d 798 (11th Cir. 1991); *United States v. Real Property Located at*

2471 *Venus Dr., Los Angeles, Cal.,* 949 F.2d 374 (10th Cir.1991); *United States v. Real Property Located at 41741 National Trails Way, Daggett, Cal.,* 989 F.2d 1089, 1092 (9th Cir.1993).

6. A forfeiture under the Comprehensive Drug Abuse Prevention and Control Act is similar to a forfeiture under RICO for a takings analysis which applies constitutional rather than statutory principles.

the sovereign immunity of the Government and its property from suit."); *Metmor*, 819 F.2d at 450 (just compensation defined as "fair market value of property on the date it is appropriated ... the date of the transfer of title"). The United States owed just compensation to the Sheldens, defined as the fair market value of their property interest on the effective date of the forfeiture judgment. *See Yancey*, 915 F.2d at 1543 ("Fair market value under the Fifth Amendment is normally ascertained at the date ... of the taking.") (citing *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 14, 104 S.Ct. 2187, 2196, 81 L.Ed.2d 1 (1984)). By relinquishing its interest in the Moraga property, the United States only partially compensated the Sheldens. The government did not negate the fact that a taking had already occurred.[7]

The government argues that Washington had legal title to and control over the Moraga property and, therefore, the Sheldens could validly foreclose against him. However, the forfeiture order made clear that all of Washington's interest was transferred to the United States as of January 20, 1984. Although record title remained with Washington for the convenience of the parties while Washington appealed the RICO conviction, title to the property was forfeited. Washington's holding record title could not affect any transactions relating to the property by allowing him to transfer title in light of the effective transfer of title to the government. In addition, record title remained with Washington only until final determination was made in his RICO appeal. During the appeal process, there was always a chance that title would ultimately vest irrevocably with the United States, as in fact happened after Washington's guilty plea. Washington was allowed to manage the property pursuant to

the forfeiture order, but only during the appeal process and afterwards conditioned on his winning. Thus, Washington did not have legal title and control over the property that would allow him to transfer title. The Sheldens could gain nothing by foreclosing against him. They could neither take Washington's title to the property nor force the sale of his interest in the property because the United States held his ownership interest and, therefore, title.

The government does not satisfactorily answer the question of the status of the Sheldens' title after title irrevocably vested in the United States. At oral argument counsel for the government stated that whether or not the Sheldens received clear title through the foreclosure proceedings was a separate issue, not pertinent to whether there had been a taking. This position is untenable. If the Sheldens did not receive clear title, then the government maintained an interest in the property. If the government maintained an interest in the property, then the Sheldens had no way of getting that interest from the government without its consent. The Sheldens received the quitclaim deed that gave them clear title only through the good graces of the United States. They could not have forced the government to relinquish the deed due to the government's sovereign immunity.[8] Under *Armstrong* this situation clearly results in a taking. 364 U.S. at 46, 80 S.Ct. at 1567.

The government attempted to maintain an ownership interest in the Moraga property, with the ability to receive irrevocable title upon failure of Washington's appeal while at the same time eschewing any responsibility for the property, forcing the Sheldens to look only to the Washingtons for compensation. This the government cannot do. The gov-

---

7. Even if the government had granted the Sheldens a quitclaim deed on an earlier date, such as the date the Sheldens foreclosed on the property, the government would still be liable for taking the Sheldens' property interest as of the day Washington's interest transferred to the United States.

8. The parties raise the issue that the United States has waived its sovereign immunity and consented to be sued in a civil action to adjudicate a disputed title to real property in which the

United States claims an interest in the Quiet Title Act, 28 U.S.C. § 2409a (1988). The Act provides an ineffectual remedy for the Sheldens because subsection (b) gives the United States the same power to possess the property that it otherwise enjoys under the doctrine of sovereign immunity. 28 U.S.C. § 2409a ("[I]f the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto....").

ernment commits a taking when it exercises its statutory rights and maintains its sovereign immunities under the circumstances here.

### E. Compensation

 Just compensation for a plaintiff in a takings case is typically defined as the fair market value of the property on the date it is appropriated. *Yancey*, 915 F.2d at 1543 (citing *Kirby Forest Indus.*, 467 U.S. at 14, 104 S.Ct. at 2196). The United States must compensate the Sheldens for the fair market value of the mortgage on the Moraga property as of the date that the property was transferred to the United States. However, the amount of compensation due will be lessened by the compensation already received, such as the mortgage payments made by Washington after the property was transferred to the United States and the market value of the property when the Sheldens regained clear title by the government's delivering a quitclaim deed to them on October 9, 1990.

We remand the case to the Court of Federal Claims for a determination of the proper compensation to be awarded to the Sheldens in a manner consistent with this opinion.

### IV. CONCLUSION

Before the mortgage was destroyed by the government's taking, the Sheldens had a compensable property interest. Immediately after the judgment of forfeiture they had none. Whether the government had the intent and purpose of extinguishing the mortgage or not, the government's actions did destroy the mortgage and take the value of the Shelden's interest in the property. The government has a Constitutional obligation to pay just compensation to the Sheldens since the government's acquisition of their property was for a public use.

For the reasons stated, we 1) reverse on the issue of liability; and 2) remand to the United States Court of Federal Claims with instructions that judgment be entered for the Sheldens once the compensation due has been determined.

*REVERSED AND REMANDED.*

### COSTS

Each party to bear its own costs.