**Ross L. BAIR, et al., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 04–1689C.

United States Court of Federal Claims.

Jan. 11, 2007.

Bryce James Wilcox, Luskin & Annis, P.S., Spokane, WA, Counsel of Record for Plaintiff.

Gregory Thomas Jaeger, Commercial Litigation Branch, Department of Justice, Washington, D.C., Counsel of Record for the Defendant. With him on the briefs were David

M. Cohen, Director, and Peter D. Keisler, Assistant Attorney General.

Michael E. Trow, Office of General Counsel, Department of Agriculture, Portland, OR, Of Counsel for Defendant.

## OPINION

BASKIR, Judge.

This case involves an alleged taking without compensation in violation of the Fifth Amendment. The Plaintiffs ("Growers") claim they have state law liens on the crop of sugar beets delivered in 2000 to Pacific Northwest Sugar Company, LLC ("PNSC"). The Commodity Credit Corporation ("CCC") has a superior interest in the same sugar as a result of PNSC's utilization of a Federal program that provides loans to beet processors in exchange for a "super-priority" security interest in sugar inventory. The Growers' state law liens on 2000 crop year sugar attached before PNSC entered into the loan agreements secured by the same sugar. The Growers claim that the application of the super-priority loan provision, 7 U.S.C. § 7284(d), destroys the value of their now subordinated liens and constitutes an uncompensated taking. The Government argues that the provision operated as a pre-existing limitation on the property rights that the Growers could acquire. The case is before us on cross motions for summary judgment.

The Federal statute at issue here speaks directly to the priority of security interests, one of the statutorily defined property rights that make up a lien. We find that the statute altered the nature of the processor liens from their inception. **The Plaintiffs' Motion for Summary Judgment is DENIED, and the Defendant's Cross Motion is GRANTED.**

### Background

I. *The Sugar Beet Industry*

The background provided here represents the Court's synthesis of information found in the Parties' submissions and the legislative history of the Agriculture Market Transition Act (Pub.L. No. 104–127, Title I, 110 Stat. 896 (1996)). Although it is helpful to an

understanding of the context of this case, this information is not material to the holding. A dispute regarding these background facts would not preclude summary judgment.

### A. Sugar Beet Farming

The sugar beet "crop year" begins with the harvest in September, October and November. Beets are delivered to processing factories as they are harvested. Sugar beets are perishable, so processing must take place as rapidly as possible. From mid-September until mid-February, factories run full-tilt to convert the beets into refined sugar, or at least into less perishable intermediate stages of syrup. The urgency is reflected in the terminology: this period is called the sugar beet "campaign."

Storage capacity at sugar processing factories is very limited. Processors do not have the ability to hold onto inventory and wait for favorable market conditions. They must sell the majority of each year's sugar as it is processed, frequently on 3, 6, or 12 month forward sales contracts that lock in low prices.

### B. Federal Sugar Policy

American involvement in the sugar trade predates the Constitution. Some of the best known New England families owe their fortunes to rum smuggling, viewed as a patriotic protest to the British Parliament's 1733 Molasses Act and 1763 Sugar Act. Rum Trade, Dictionary of American History, Volume VI at 170 (Charles Scriber's Sons, rev. ed., 1976). The Federal Government has been tinkering with the sugar market since the First Congress imposed a tariff on imported sugar in 1789. 1 Stat. 24, 25. Loans to processors (described below) were first used as a means of supporting the industry in 1977. Food and Agriculture Act of 1977, Pub.L. No. 95–113, Title IX, § 902, 91 Stat. 913, 949. This dispute arises against the background of reforms to the sugar support program made in the Agriculture Market Transition Act (Pub.L. No. 104–127, Title I, 110 Stat. 896 (1996)) in response to concerns about excessive government intervention and inflated prices. See 142 Cong. Rec. 2503–2509 (Senate debate regarding extension of the sugar program); 142 Cong. Rec. 3152–3164 (House debate regarding phase-out of the sugar program).

In the 1996 Act, Congress made several changes to the sugar program that had a destabilizing impact on the market. Historically, the Secretary of Agriculture had two tools to control supply in the sugar industry and keep prices high enough to prevent loan forfeiture: the tariff-rate quota program to control imports and marketing allotments authority to control domestic production. The Secretary's control over imports is limited because of international treaty obligations. The 1996 reforms eliminated the remaining tool, market allotments. Pub.L. No. 104–127, Title I, § 171(a)(1)(E), 110 Stat. 937. This led to extensive instability in the sugar market and a glut of supply. The price for wholesale beet sugar dropped to its lowest level in 22 years in late 1999 and early 2000. More than 25% of the beet or cane processing facilities operating in 1996 shut down between 1996 and 2001. Testimony of the American Sugar Alliance to the U.S. Department of Agriculture, March 12, 2003, available at www.fsa.gov/ao/epas/dsa/USDA—Policy—Implemt—Roney—031203.pdf. Congress restored the Secretary's marketing allotments authority in the 2002 Farm Bill. 7 U.S.C. § 1359bb, Pub.L. No. 107–171, Title I, § 1403, 116 Stat. 188.

The 1996 reforms also suspended 7 U.S.C. § 1421, which provided for direct payments from the government to growers in the event of producer default due to insolvency. Pub.L. No. 104–27, Title I, § 171(b)(1)(J), 110 Stat. 937. Prior to 1996, sugar beet producers who were not paid in full by processors were guaranteed payment of at least the price support level established by the Secretary. The Growers argue that before its suspension, § 1421 provided compensation for the taking worked by 7 U.S.C. § 7284(d), the super-priority provision that is the subject of this case. In their brief, the Growers assert that § 1421 was suspended only from 1996–2002. Pls.' Rep. and Resp. at 2 n. 1. This is not correct. The suspension of § 1421 remains in effect for the 2002–2007 crop years. Pub.L. No. 107–171, Title I, § 1602(b)(10), 116 Stat. 213.

### C. CCC Loans

A major component of Federal support of the sugar industry (beet and cane) is a loan program made available to processors through the Commodity Credit Corporation. The terms of the loan program in effect for the crop years 1996–2002 are summarized below and are codified at 7 C.F.R. §§ 1435.100–1435.111 (1999).

Sugar loans become available on October 1 of the crop year. Loans mature on the earlier of September 30 or the last day of the ninth month after the loan is made. The average national loan rate is set by Federal statute at $22.90 per hundredweight of sugar (7 U.S.C. § 7272 (1996)) and adjusted for local conditions by state and county offices of the Farm Service Agency. Processors pledge refined sugar from domestically grown and processed beets as security. The CCC's super-priority interest in the sugar and crops, which the Plaintiffs here allege works a taking, is provided in 7 U.S.C. § 7284(d):

> A security interest obtained by the Commodity Credit Corporation as a result of the execution of a security agreement by the processor of sugarcane or sugar beets shall be superior to all statutory and common law liens on raw cane sugar and refined beet sugar in favor of the producers of sugarcane and sugar beets and all prior recorded and unrecorded liens on the crops of sugarcane and sugar beets from which the sugar was derived.

Processors have two options upon maturation of a loan. They may redeem the sugar held as collateral by paying off the loan (and then sell the sugar on the market), or they may forfeit the loan and turn over title to the sugar to the CCC. In the latter case, processors effectively sell the sugar to the government at the loan rate of $22.90 per hundredweight, less a small forfeiture penalty. Upon forfeiture, the CCC takes title to the sugar collateral, but the sugar remains in the processors' facilities.

In theory, the loan rate acts as a guaranteed floor price for sugar processors. However, limited storage capacity combined with poor market conditions can push processors into debt to the CCC. If a processor has loans on a larger quantity of sugar than it has room to store, it must sell it at the market price. The proceeds of sale will be insufficient to pay back the CCC loans secured by the same quantity of sugar, leaving the processor with insufficient sugar or proceeds to satisfy all of its CCC loans.

### II. Washington State Processor Liens

Washington state law grants producers of raw agricultural products "processor liens" attaching to the delivered products and the assets of defaulting processors. Wash. Rev. Code § 60.13.020. The liens are created automatically and continue without filing requirements for twenty days after payment by the processor is due and remains unpaid. *Id.* The date of attachment is retroactive to the date of delivery of the agricultural products to the processor. *Id.* In order to preserve the lien, and the retroactive attachment to the delivery date, producers must file an official lien statement within the twenty-day period. Wash. Rev.Code §§ 60.13.040, 60.13.050.

It is important to note that although the Washington statute refers to processor liens as "first priority statutory liens," this nomenclature is misleading. If the producer fails to officially file within the twenty-day period, the liens are subordinate to perfected security interests and to any other liens attaching prior in time. Even if the producer officially files within the twenty-day period, the liens are still subordinate to liens for taxes or labor perfected before the filing. Wash. Rev. Code § 60.13.050. Within the hierarchy of state law, therefore, processor liens are actually third in priority.

### III. Plaintiffs' Beets and the CCC Loans

The following facts are drawn from the Parties' Consolidated Statement of Uncontroverted Facts.

The Growers are 46 sugar beet farmers in the state of Washington. Most, if not all, are members of a growers' cooperative founded in 1991 called the Columbia River Sugar Company ("CRSC"). CRSC and a major sugar processing company, Holly Northwest, formed a limited partnership to build and

operate a beet processing plant in Moses Lake, Washington. CRSC controlled 57% of the partnership. Prior to the completion of the factory, the Growers delivered their sugar beets to processors in California and Idaho. Upon its completion in 1998, Growers delivered their beets to the Moses Lake factory.

The 1998 campaign at Moses Lake was a failure to such an extent that over 300,000 tons of beets spoiled before they could be processed. Holly Northwest wanted to terminate its involvement, so CRSC formed a limited liability company, PNSC, which bought out Holly's interest in the factory. CRSC was and is the sole member of PNSC.

The Growers entered into an agreement for the 1999–2003 crop years to deliver their beets to CRSC, which in turn would sell them to PNSC for processing. The 1999 crop year beets were delivered and processed into sugar that was used as collateral for CCC loans. Because wholesale sugar prices were low in 1999, PNSC forfeited the loans. CCC therefore took title to approximately 53.7 million pounds of sugar that remained in storage at the factory.

In 2000, the Growers individually entered "Beet Purchase Agreements" directly with PNSC to grow and deliver beets, suspending the 1999–2003 agreement whereby CRSC acted as the middleman. The Beet Purchase Agreements provided for delivery of all beets by December 1, 2000. PNSC was to make incremental payments to growers of 25% of the contract price on December 5, 2000, 15% on the fifth day of each of the months of January, February, March and April 2001 and the remaining 15% on or before October 25, 2001.

All of the Growers' beets were delivered by December 1, 2000. The incremental payments were made in December, January and February, totaling 55% of the contract price. The March payment was not made. Within twenty days of nonpayment, the Growers followed the appropriate filing procedures to preserve their processor liens under Washington law.

Between October 10, 2000 and February 12, 2001, the CCC made 21 nonrecourse loans to PNSC. The loan rate applicable in the region was $22.08 per hundredweight. The value of the 21 loans totaled $32,051,755.68. The CCC only accepts refined sugar, not beets, as collateral, so loans were made as sugar was refined. For each batch of sugar, the Growers' processor liens, which attached on the date of beet delivery pursuant to state law, necessarily predated CCC loans secured by that sugar.

As discussed above, the sugar industry faced challenging economic conditions in 2000. There are also indications in the record that PNSC's limited storage capacity was further reduced because it was already storing large quantities of sugar forfeited to CCC for 1999 loans. For these or other reasons, PNSC could clear only some of the 21 CCC loans for the 2000 crop year through forfeiture. In order to make payments against the remaining loans, it had to sell some of its sugar at a price much lower than the loan amount due on the same sugar. This necessarily left the company with insufficient funds to clear all of its CCC loans. There appears to be some dispute between the parties as to whether four or five loans remain outstanding, but it is undisputed that after satisfaction of the Government's claims, no sugar or proceeds remain to apply toward the Growers' claims.

IV. *Procedural History*

After PNSC defaulted on its payments, the Growers attempted to foreclose on their processor liens in state court. The Government intervened and removed the case to Federal court. The Growers sought a declaration that their processor liens were superior to the CCC liens or in the alternative, that the application of 7 U.S.C. § 7284(d) was an unconstitutional taking.

The District Court for the Eastern District of Washington found that the CCC liens were indeed superior to Growers' state law liens, and granted the CCC's Motion for Summary Judgment. *Bair v. Pacific Northwest Sugar Co., LLC,* No. CS–01–0310–AAM (E.D.Wash. Feb. 21, 2002) (unpublished). The Court of Appeals for the Ninth Circuit affirmed. *Bair v. Pacific Northwest Sugar Co. LLC,* 85 Fed.Appx. 555 (9th Cir.2004)

(not selected for publication in the Federal Reporter). Because the Growers' takings claim against the United States exceeds $10,000, the U.S. Court of Federal Claims has exclusive jurisdiction to render judgment. 28 U.S.C. §§ 1346, 1491.

On November 19, 2004, the Growers filed a complaint in this Court based on their takings theory of the case.

### Discussion

#### I. *Standard of Review*

This case comes before the Court on cross motions for summary judgment. The standard for determination is well-known. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the Court must resolve all reasonable inferences in favor of the nonmoving party. *Champagne v. United States,* 35 Fed.Cl. 198, 206 (1996). When, as here, there are cross motions for summary judgment, the Court must evaluate each motion individually, making inferences against the moving party with respect to each motion. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001). The existence of *any* factual dispute is not sufficient for a party to survive summary judgment—the dispute of fact must be material to the legal issue. *Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. 2505.

There are very few factual disputes in this case. None are material to the legal question of whether 7 U.S.C. § 7284(d) operates to effect a taking of the lien interests that the Growers could acquire in the beet crop.

#### II. *Jurisdiction*

Jurisdiction in this case is not disputed. However, the parties may not confer jurisdiction by agreement. The Court must satisfy itself. The Tucker Act confers jurisdiction upon the United States Court of Federal Claims over certain suits for money against the United States founded upon the Constitution or other laws and waives sovereign immunity. 28 U.S.C. § 1491. The substantive right to money from the United States must be found outside the Tucker Act. *See e.g., United States v. Mitchell,* 463 U.S. 206, 216–217, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Constitutional jurisdiction must be based on a money-mandating constitutional provision. *Id.* The takings clause of the Fifth Amendment is such a provision. *See e.g. United States v. Causby* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) ("If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine.")

#### III. *The Alleged Taking*

In order to succeed in a takings claim, the Growers must first establish that they have a property interest protected by the Fifth Amendment. *Members of Peanut Quota Holders Assoc., Inc. v. United States,* 421 F.3d 1323, 1329 (Fed.Cir.2005). There is general acceptance of the view that liens are property for purposes of the Fifth Amendment.

Liens can be created by common law, statute or equity. 1 Law of Debtors and Creditors § 9:2. Using the familiar "bundle of sticks" metaphor for property interests, the sticks that make up a statutory lien are such things as the class of creditors who may assert it, the class of debtors against whom it may be applied, the type of property that may be attached, the procedures for perfecting the lien, and most important for our purposes, the priority of the lien as against competing security interests. *Id.* at §§ 9:7–12. The sticks that make up the processor liens at issue here are defined in Wash. Rev.Code § 60.13.020 *et seq.* The Government's position is that the Growers' lien interests are further defined by the terms of the federal sugar loan program statute, particularly the CCC super-priority provision, 7 U.S.C. § 7284(d). The parties have offered up two widely different theories of the effect of Federal law on the Growers' property interests. We start with a discussion of the Growers' position.

#### A. *Growers' "Destruction of Value" Theory*

The Growers advance the proposition that government action that destroys the value of

a lien or renders it unenforceable constitutes a Fifth Amendment taking. Plaintiffs' Memorandum 9; Plaintiffs' Reply and Response 20. The Growers' argument, in its simplest terms, is as follows: Under the Washington statute, the Growers' processor liens attached as of the date of delivery of the beets, before PNSC applied for or received the CCC loans. The Growers are now unable to collect anything on the liens because the later in time super-priority CCC liens have exhausted the assets of PNSC. Therefore, a taking of their property interest in the liens must have occurred in the interim.

The Growers cite in support *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), *Shelden v. United States*, 7 F.3d 1022 (Fed.Cir.1993), *In re Metmor*, 819 F.2d 446 (4th Cir.1987) and *Murray v. United States*, 817 F.2d 1580 (Fed.Cir.1987). Each of these cases involves a security interest attaching to property owned by private parties that later became the property of the government. In each case, the holders of the security interest prevailed in the vindication of their property interest. However, we find the cases inapposite to the Growers' claim.

In *Armstrong*, pursuant to contract, the government took title to several boats being constructed for the Navy when the prime contractor defaulted. Plaintiff subcontractors had state-law materialmen's liens on the boats. When the government took title, the liens were rendered useless because the doctrine of sovereign immunity barred their enforcement. The Supreme Court held that the destruction of the liens constituted a Fifth Amendment taking.

In *Shelden*, the innocent third-party plaintiffs had a mortgage interest in property seized by the government under RICO forfeiture provisions (18 U.S.C. §§ 1961 *et seq.*). The court held that title to the property was effectively transferred to the United States by the Order of Forfeiture. As in *Armstrong*, the doctrine of sovereign immunity made the otherwise valid mortgage lien legally unenforceable. The Federal Circuit concluded that a taking had occurred.

In *Metmor*, the government seized property under the Comprehensive Drug Abuse Prevention and Control Act (21 U.S.C. § 881) subject to a mortgage lien held by the innocent third-party plaintiff, but refused to make interest payments due under the mortgage. The court found that Metmor's rights in the property encompassed the right to interest payments. The statute prevented government seizure of any property rights held by innocent owners. Although cited by the Plaintiffs for the court's positive treatment of *Armstrong*, strictly speaking, *Metmor* does not involve a taking. It is well-established that a government appropriation of property must be authorized by law in order to be subject to analysis as a taking. *See e.g. Short v. United States*, 50 F.3d 994, 1000 (Fed.Cir.1995). The court in *Metmor* found that the government's action was contrary to law, not an otherwise lawful taking requiring compensation.

*Murray* also involved government activity contrary to law. It concerns a refusal by the IRS to allow mortgage holders to redeem foreclosed property, contrary to 26 U.S.C. § 6337(b)(1) (1987). The court cited the takings analysis of *Armstrong* and held that the Murrays had established a cause of action. The merits of the plaintiffs' takings claim were never addressed because on remand, the underlying mortgage interest was held invalid. *Murray v. United States*, 15 Cl.Ct. 17 (1988), *aff'd*, 864 F.2d 148 (Fed.Cir.1988).

In summary, each of the cases cited by the Growers is distinguishable. The taking in *Armstrong* was occasioned by operation of a government contract to which the lienholders were not parties, rather than a statute, making it of questionable value as precedent for our purposes. By contrast, *Shelden* does involve a statute (the RICO forfeiture provisions, 18 U.S.C. §§ 1961 *et seq.*). In both cases, however, the doctrine of sovereign immunity created an absolute barrier to the enforcement of liens against property titled to the government. The liens were rendered legally unenforceable, thus destroying them utterly. *Metmor* and *Murray* are similar to *Shelden* and *Armstrong* in this respect—the government action amounted to completely ignoring the legal existence of the security interests, not changing their value. In contrast, the processor liens here are still legally

recognized, although their value may be impaired by the absence of sufficient assets to satisfy prior claims.

In addition to the absence of legal support for their position, the Growers' theories confront practical problems. The exact nature and timing of the government action that constitutes a taking was never clarified in the Growers' briefs or in oral argument before this Court. We think the Growers' difficulty in pinpointing the taking is due to the fact that their losses are actually the result of financial and market circumstances, not government action. It is true that the Growers can expect to recover nothing from their 2000 processor liens. However, unlike the cases cited by the Growers, the government action here does not create an absolute legal barrier to enforcement of their claims. In *Armstrong,* the dollar value of the uncompleted boats made no difference; there was no way for the materialmen to enforce their claims because of sovereign immunity. Similarly, in *Shelden,* the "critical fact" was that "the Sheldens could not enforce the mortgage against the United States." 7 F.3d at 1028. The value of the mortgaged property had nothing to do with enforceability.

The Growers' theory, in contrast, makes the existence or non-existence of a taking dependent on management practices or market conditions, rather than on the nature of the challenged government activity. If PNSC had had enough storage capacity to permit it to forfeit on all of the 2000 sugar loans, or if the market price of sugar had been high enough, the CCC security interests could have been satisfied. Sugar and proceeds might have remained to satisfy the Growers' claims. A lien is not a guarantee of payment—even in the absence of the super-priority statute, each grower's lien would still be inferior to tax and labor liens under the terms of the Washington statute, and also to the liens of growers who delivered beats earlier in the season.

B. *The Government's "Pre–Existing Limitation" Theory*

The Government contends, and we agree, that 7 U.S.C. § 7284(d), giving CCC security interests priority over other liens, modified

the statutory definition of the processor lien. When the Growers' liens attached, they were already subject to the possibility that the CCC would acquire a higher priority interest. The Federal statute created a pre-existing limitation on the property rights that the Growers could acquire under state law. The Growers still have what they always had— valid liens on the sugar attaching on the date of delivery, but liens that are secondary to superior CCC security interests that might thereafter attach. Since the Growers' liens were always subject to the limitations of § 7284(d), that law's application does not constitute a taking.

In support of its pre-existing limitation argument, the Government analogizes § 7284(d) to the lien avoidance provision of the Bankruptcy Code, 11 U.S.C. § 522(f). The provision allows debtors to avoid the operation of liens attached to certain types of exempt property such as household goods, implements of the debtor's trade, or medically prescribed health aids. Creditors with non purchase-money, non-possessory security interests attaching to the covered categories cannot enforce them against debtors who file for bankruptcy. Like processor liens affected by the CCC super-priority provision, the security interests affected by § 522(f) attach before the action of the debtor brings the statute into play by filing for bankruptcy.

The Supreme Court confirmed the constitutionality of § 522, at least implicitly, in *United States v. Security Industrial Bank,* 459 U.S. 70, 75, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). The case involved a challenge to the retroactive application of the lien avoidance provisions to security interests created before the passage of the statute. The court read the statute to apply only prospectively in order to avoid a violation of the Fifth Amendment. Implicit in the court's reading is an acknowledgment of the constitutionality of prospective application and of the "preexisting limitation" theory.

The case *In re Leicht,* 222 B.R. 670 (1st Cir. BAP 1998) provides the clearest formulation of the pre-existing limitation argument. The Government did not cite this case in its original brief, although the Government relies extensively on other cases approving

§ 522, including *In re Thompson,* 867 F.2d 416 (7th Cir.1989) and *In re Weinstein,* 164 F.3d 677 (1st Cir.1999). Although it recognized that liens are property interests protected by the Fifth Amendment, the court in *Leicht* found that no taking had occurred. A lien "is no more than what the law defined it to be at the time it arose. And here is the Achilles heal of [creditor's] takings challenge. The lien was born subject to the Leicht's right to avoid it pursuant to § 522(f)(1)." 222 B.R. at 683. The lien avoidance provision operated as a pre-existing limitation on property rights.

The Growers challenge the applicability of the § 522 cases to the current dispute, arguing that bankruptcy is a special context because of the specific grant of power to establish "uniform Laws on the Subject of Bankruptcies." U.S. Const. art. I, § 8, cl. 4. We find this argument unconvincing and flatly contradicted by the case law. *See e.g. Security Industrial Bank,* 459 U.S. at 75, 103 S.Ct. 407 ("The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation."); *see also Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 589, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment.")

There is a very clear distinction between the § 522 cases and the Growers' lien destruction cases. The lien avoidance provisions of the Bankruptcy Code are designed to alter property interests, making them similar to the lien priority provision at issue in this case.

The Growers contend that the holdings in *Armstrong, Shelden* and *Metmor* contradict the Government's pre-existing limitation theory because the courts found that takings had occurred even though the forfeiture statutes at issue (or the doctrine of sovereign immunity in *Armstrong*) predated the creation of the disputed liens. This argument fails because the statutes at issue in the Growers' cases were not directed at property interests. The forfeiture provisions of RICO and the Comprehensive Drug Abuse Prevention and Control Act are intended to seize property that has been "tainted" by criminal activity. Nothing in either statute purports to alter the property interests of innocent third parties. Similarly, the doctrine of sovereign immunity is a general legal principle not specifically directed at property interests. The impact on property rights in those cases was incidental to Congress' real aim. In contrast, § 7284(d) directly addresses lien priority, altering the Growers' liens from the outset.

At the request of the Court, the Parties provided supplemental briefing on whether the priority of Federal tax liens possibly provided a useful analogy for deciding this case. However, Federal tax lien cases are not specifically helpful in addressing the Fifth Amendment takings claim at issue here.

Neither the parties nor the Court has found any cases involving the taking clause and its possible application to federal tax lien priority. However, the cases do underline the conditional nature of the Growers' lien interests. Prior to Congressional action protecting certain classes of non-federal liens (passage of the Federal Tax Lien Act of 1966, Pub.L. No. 89–719, 80 Stat. 1125), the courts protected the priority of Federal tax liens with an extremely strict "choate lien" test that modified the normal "first in time is first in right" principle. *See In re Estate of Romani,* 547 Pa. 41, 688 A.2d 703, 706 (1997) (discussing *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)). It is well-established that although the existence of an attachable property interest is a matter of state law, the priority of Federal liens that may attach to it is a Federal question. *See United States v. Craft,* 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (citing *United States v. Bess,* 357 U.S. 51, 56–57, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958)). The essential point of this brief foray into Federal tax lien jurisprudence is that state created property rights are circumscribed or modified by federal law in a number of contexts, without amounting to a taking under the Fifth Amendment.

### Conclusion

For these reasons, we find that 7 U.S.C. § 7284(d) operated to alter the nature of the

Growers' processor liens from their inception. Therefore, the Growers have not suffered a taking. **The Plaintiffs' Motion for Summary Judgment is DENIED, and the Defendant's Cross Motion is GRANTED. Clerk of the Court is directed to enter judgment in favor of the Defendant.** Parties are to bear their own costs.

IT IS SO ORDERED.